**WARNER–LAMBERT PHARMACEUTI-CAL COMPANY, Inc., Plaintiff,**

v.

**JOHN J. REYNOLDS, INC.,** American Bible Society, Susan Hopkins Whitmore, Josephine Hopkins Graeber, Minnie Hopkins Gilbert, individually and as Trustee, and John Graeber, as Trustee, Defendants.

United States District Court
S. D. New York.
Nov. 16, 1959.

Mudge, Stern, Baldwin & Todd, New York City, for plaintiff, Clifton Cooper, H. G. Pickering, Milton Black, Leonard Garment, New York City, of counsel.

Milbank, Tweed, Hope & Hadley, New York City, for individual defendants, Harrison Tweed, William Eldred Jackson, Rebecca M. Cutler, New York City, of counsel.

Hodges, Reavis, McGrath & Downey, New York City, for defendant, John J. Reynolds, Inc., John P. McGrath, Martin D. Jacobs, New York City, of counsel.

Burke & Burke, New York City, for defendant, American Bible Soc., William E. Vogel, New York City, of counsel.

BRYAN, District Judge.

Plaintiff sues under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, for a judgment declaring that it is no longer obligated to make periodic payments to defendants based on its manufacture or sale of the well known product "Listerine", under agreements made between Dr. J. J. Lawrence and J. W. Lambert in 1881, and between Dr. Lawrence and Lambert Pharmacal Company in 1885. Plaintiff also seeks to recover the payments made to defendants pursuant to these agreements since the commencement of the action.

Plaintiff is a Delaware corporation which manufactures and sells Listerine, among other pharmaceutical products. It is the successor in interest to Lambert and Lambert Pharmacal Company which acquired the formula for Listerine from Dr. Lawrence under the agreements in question. Defendants are the successors in interest to Dr. Lawrence.

Jurisdiction is based on diversity of citizenship.

For some seventy-five years plaintiff and its predecessors have been making the periodic payments based on the quantity of Listerine manufactured or sold which are called for by the agreements in suit. The payments have totalled more than twenty-two million dollars and are presently in excess of one million five hundred thousand dollars yearly.

All of the defendants move to dismiss the second amended complaint, pursuant to Rule 12(b) (6), F.R.Civ.P., 28 U.S.C.A., for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment, pursuant to Rule 56, F.R.Civ.P. In support of the motions for summary judgment defendants rely on the second amended complaint, extensive affidavits and a number of depositions which they have taken during the course of the action. Plaintiff has submitted a number of affidavits in opposition. I will not attempt to pass separately on the motions to dismiss under Rule 12(b) (6), but will address myself to the motions for summary judgment.

As will become apparent from the discussion which follows I find no genuine issue as to any material fact which requires a trial. Such issues of fact between the parties as may exist are peripheral only and are not material to the basic questions to be determined. In my view the defendants, upon the undisputed facts, are entitled to judgment as a matter of law.

The various writings which passed between the predecessors in interest to the parties, and which are the subject of the controversy, are before the court and there is no question as to their authenticity. Those which were not annexed to the pleadings were produced during the extensive discovery proceedings conducted during the course of the action. These proceedings have narrowed the issues considerably.

In the early 1880's Dr. Lawrence, a physician and editor of a medical journal in St. Louis, Missouri, devised a formula for an antiseptic liquid compound which was given the name "Listerine". The agreement between Lawrence and J. W. Lambert made in 1881, and that between Lawrence and Lambert Pharmacal Company made in 1885, providing for the sale of the Lawrence formula, were entered into in that city. Lambert, and thereafter his corporation, originally engaged in the manufacture and sale of Listerine and other pharmaceutical preparations on a modest scale there. Through the years the business prospered and grew fantastically and Listerine became a widely sold and nationally known product. The Lambert Pharmacal Company, with various changes in corporate structure and name which are not material here, continued the manufacture and sale of Listerine and other preparations until March 31, 1955, when it was merged into Warner-Hudnut, Inc., a Delaware corporation, and the name of the merged corporation was changed to Warner-Lambert Pharmaceutical Company, Inc. The plaintiff in this action is the merged corporation which continues the manufacture and sale of Listerine.

Plaintiff's second amended complaint in substance alleges the following:

Prior to April 20, 1881 Dr. Lawrence furnished Lambert with an unnamed secret formula for the antiseptic compound which came to be known as "Listerine", and on or about that date Lambert executed the first of the documents with which we are concerned here. This document, in its entirety, reads as follows:

"Know all men by these presents, that for and in consideration of the fact, that Dr. J. J. Lawrence of the city of St Louis Mo has furnished me with the formula of a medicine called Listerine to be manufactured by me, that I Jordan W Lambert, also of the city of St Louis Mo, hereby agree for myself, my heirs, executors and assigns to pay monthly to the said Dr. J. J. Lawrence his heirs, executors or assigns, the sum of twenty dollars for each and every gross of said Listerine hereafter sold by myself, my heirs, executors or assigns. In testimony whereof, I hereunto set my hand and seal, Done at St Louis Mo. this the 20th day of April, 1881 Jordan W Lambert (Seal)"

On or about May 2, 1881 Lambert began the manufacture of the formula and adopted the trademark "Listerine." [1] The agreed payments under the 1881 agreement were reduced on October 21, 1881 by the following letter addressed to Lambert by Lawrence:

"I hereby reduce my royalty on Listerine from twenty dollars pr gross 'to twelve dollars pr gross on the condition that a statement of your sales made each preceding month be rendered to me promptly on or before the 10th of each month, and payment of the amount due me on said royalty be made to me or my heirs at the same time. I also hereby waive any demands of royalty on you preceding the 1st of October 1881—"

They were again reduced on March 23, 1883 by a similar letter reading as follows:

"I hereby reduce my royalty on Listerine from ten pr cent on gross amount of sales to six dollars pr gross, the same reduction is hereby made on my royalty on Renalia. Wishing you great prosperity"

Thereafter Lambert assigned his rights to Listerine and other Lawrence compounds to the Lambert Pharmacal Company and this company on January

1. Plaintiff urges that there is dispute between the parties as to whether the name "Listerine" was coined by Lawrence or Lambert and that this is a material issue which must be tried. In the view I take of the case it is unnecessary to decide this question, which, in any event, at this late date can probably not be answered with any reasonable degree of certainty.

2, 1885 executed an instrument assuming Lambert's obligations under these agreements with Lawrence and other obligations on account of other formulas which Lawrence had furnished, in the following language:

"J. J. Lawrence of St Louis Mo, having originated & heretofore sold to J W Lambert, the formulae & processes for the manufacture of two medical preparations, known as Listerine and Lithiated Hydrangea, with all the rights & benefits accruing therefrom and has received therefor a monthly royalty from J. W. Lambert, and J. W. Lambert having sold said formulae of Listerine & Lithiated Hydrangea to the Lambert Pharmacal Company, a corporation organized under the laws of the State of Missouri, and doing business in St Louis, and furthermore said J. J. Lawrence having sold to said Corporation his sole & exclusive right to the formulae & processes originated by him for making two preparations called 'Dugongol' & Menthated Camphor, therefore know all men by these presents that for & in consideration of these facts, the said Lambert Pharmacal Co. hereby agrees and contracts for itself & assigns to pay to the said J. J. Lawrence, his heirs, executors & assigns, six dollars on each & every gross of Listerine & Lithiated Hydrangea manufactured or sold by the said Lambert Pharmacal Co. or its assigns, and ten per cent (10%) on gross amount of sales of the said Dugongol & Menthated Camphor, and all other goods which said Lambert Pharmacal Co. or its assigns may hereafter manufacture or sell on formulae furnished by said J J Lawrence, account of sales to be rendered & payment of said royalty to be made on the tenth day of each month. In testimony whereof said Lambert Pharmacal Co. has caused these presents to be sealed with its corporate seal and signed by its President & Secretary this second day of January 1885."

The agreements between the parties contemplated, it is alleged, "the periodic payment of royalties to Lawrence for the use of a trade secret, to wit, the secret formula for" Listerine.[2] After some modifications made with Lawrence's knowledge and approval, the formula was introduced on the market. The composition of the compound has remained the same since then and it is still being manufactured and sold by the plaintiff.

It is then alleged that the "trade secret" (the formula for Listerine) has gradually become a matter of public knowledge through the years following 1881 and prior to 1949, and has been published in the United States Pharmacopoia, the National Formulary and the Journal of the American Medical Association, and also as a result of proceedings brought against plaintiff's predecessor by the Federal Trade Commission. Such publications were not the fault of plaintiff or its predecessors.[3]

2. The first two complaints claimed that Lawrence's formula was "inadequate under modern pharmaceutical practices" and that the present manufacturing process is "entirely different" to Lawrence's and that as a result of "independent research" the present product is "greatly superior". These assertions, together with the claim that plaintiff's predecessor stopped using certain of Lawrence's ingredients because they were unsuitable or ineffectual and substituted others, have been abandoned in the present complaint. Plaintiff in this third complaint now contents itself with the assertion that at about the time the formula was delivered to Lambert four ingredients were deleted and two added with Lawrence's approval, and the product was then marketed, and that but for minor changes the product is unchanged except that modern manufacturing methods are presently used. Thus, the claim that plaintiff is relieved of its obligation to pay under the contract because the product is no longer the same has been abandoned. Plaintiff on oral argument, and in its affidavits and briefs, no longer claims that it is not required to pay because of any changes in the formula. Thus the issue is no longer in the case.

3. There are no claims here that any of the parties were in any way responsible for loss of secrecy.

The complaint recites the chains of interest running respectively from Lambert to the present plaintiff and from Lawrence to the defendants, and concludes with a prayer for a declaration that plaintiff is "no longer liable to the defendants" for any further "royalties".

The defendants have not answered the second amended complaint. However, answers to the first amended complaint were served containing certain counterclaims, not relevant here, to which plaintiff replied. In the present posture of the case the defendants do not dispute the material facts alleged in the complaint as distinguished from its characterizations and conclusions. Additional facts not in dispute were developed during the discovery proceedings, or referred to, or are set forth in the affidavits of the parties.

Despite the mass of material before me the basic issue between the parties is narrow. The plaintiff claims that its obligation to make payments to the defendants under the Lawrence-Lambert agreements was terminated by the public disclosure of the Listerine formula in various medical publications. The defendants assert that the obligation continued and has not been terminated.[4]

### (1).

The plaintiff seems to feel that the 1881 and 1885 agreements are indefinite and unclear, at least as to the length of time during which they would continue in effect. I do not find them to be so. These agreements seem to me to be plain and unambiguous.

In the 1881 agreement Lambert, for himself, his heirs, executors or assigns, agrees to pay Lawrence, his heirs, executors and assigns, "twenty dollars for each & every gross of said Listerine hereafter sold by myself my heirs executors or assigns." By the 1885 agreement the Lambert Pharmacal Company "agrees and contracts for itself & assigns to pay * * * J J Lawrence, his heirs executors & assigns, six dollars on each & every gross of Listerine * * manufactured or sold by the said Lambert Pharmacal Co. or its assigns * * *."

There is no ambiguity or uncertainty in this language. Nor can I ascertain any alternative or hidden meanings lurking within it.

The payments to Lawrence and his successors are conditioned upon the sale (in the 1881 agreement) and the manufacture or sale (in the 1885 agreement) of the medical preparation known as Listerine which Lawrence conveyed to Lambert. The obligation to pay on each and every gross of Listerine continues as long as this preparation is manufactured or sold by Lambert and his successors. It comes to an end when they cease to manufacture or sell the preparation. There is nothing which compels the plaintiff to continue such manufacture and sale. No doubt Lambert and his successors have been and still are free at any time, in good faith and in the exercise of sound business discretion, to stop manufacturing and selling Listerine. The plain meaning of the language used in these agreements is simply that Lambert's obligation to pay is co-extensive with manufacture or sale of Listerine by him and his successors.

### (2).

The plaintiff, however, claims that despite the plain language of the agreement it may continue to manufacture and sell without making the payments required by the agreements because the formula which its predecessors acquired is no longer secret. To sustain this position plaintiff invokes the shade, if not the substance, of the traditional common law distaste for contractual rights and duties unbounded by definite limitations of time

4. Plaintiff's theory is that the sole consideration for the agreement to make periodic payments based on the manufacture or sale of Listerine was what it describes as the "secret formula" which Lawrence conveyed. Whether this is so is subject to considerable doubt. However, the facts are not entirely clear and for purposes of this motion I will accept the plaintiff's theory.

and argues that absent a construction that the obligation to pay is co-extensive only with the secrecy of the formula, it must be a forbidden "perpetuity" which the law will not enforce. I find no support for the plaintiff's theory either in the cases which it cites or elsewhere.[5]

The word "perpetuity" is often applied very loosely to contractual obligations. Indiscriminate application of the term serves only to confuse. The mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties.

There are contracts in which the promisor's obligation has been expressly fixed to last forever. Such cases mainly arise in the field of real property and are governed by various considerations of public policy which have no pertinence here. See 3 Corbin on Contracts, § 533; cf. Town of Readsboro v. Hoosac Tunnel & W. R. Co., 2 Cir., 6 F.2d 733; The agreement in the case at bar does not fall within this category.

Contracts which omit any point of time or any condition which would terminate the promisor's liability are somewhat different. Town of Readsboro v. Hoosac Tunnel & W. R. Co., supra. Where it appears that the parties did in fact intend that the obligation terminate at an ascertainable time, the courts, in effect, will supply the missing clause and construe the contract accordingly. Holt v. St. Louis Trust Co., 4 Cir., 52 F.2d 1068; Town of Readsboro v. Hoosac Tunnel & W. R. Co., supra. On the other hand, if it appears that no termination date was within the contemplation of the parties, or that their intention with respect thereto cannot be ascertained, the contract will be held to be terminable within a reasonable time or revocable at will, dependent upon the circumstances. Zimco Restaurants, Inc. v. Bartenders & Culinary Workers, 165 Cal.App.2d 235, 331 P.2d 789; Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262; Freeport Sulphur Co. v. Aetna Life Ins. Co., 5 Cir., 206 F.2d 5, 41 A.L.R.2d 762; Cronk v. Vogts Ice Cream, Inc., Sup., 15 N.Y.S.2d 649.

In such cases the courts are loathe to find that the absence of a terminal point indicates an intention to contract for the indefinite future, and a perpetual obligation will not usually be inferred from the absence of a terminating date or condition. While there is no hard and fast rule, the terminal date or condition of termination will be that to be ascertained from the actual though unexpressed intention of the parties or as a remedy for their neglect. If the parties intend that the obligation be perpetual they must expressly say so. Paisley v. Lucas, supra; Town of Readsboro v. Hoosac Tunnel & W. R. Co., supra. As Judge Learned Hand says in Readsboro, (6 F.2d at page 735):

" * * * [the contract] was in terms unlimited in time, and the plaintiff apparently reasons that the defendant is bound forever to pay * * *. This seems to us untenable. Had the parties expressed the intention to make a promise * * * perpetual * * * we should, of course, have nothing to say; their words would be conclusive. But they did not, and, as no time is expressly fixed, we must look to the circumstances to learn what they meant. Their purpose is pretty evident."

Contracts which provide no fixed date for the termination of the promisor's obligation but condition the obligation upon an event which would necessarily terminate the contract are in quite a different category and it is in this category

---

5. There is no conflict of laws problem here. Though New York would probably apply the law of Missouri (Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A. L.R.2d 246; New Amsterdam Casualty Co. v. Stecker, 3 N.Y.2d 1, 163 N.Y.S.2d 626, 143 N.E.2d 357), both jurisdictions apply general rules of contract construction on all the questions presented in the interpretation of these agreements. Neither side differs as to the law to be applied.

that the 1881 and 1885 Lambert Lawrence agreements fall. On the face of the agreements the obligation of Lambert and its successors to pay is conditioned upon the continued manufacture or sale of Listerine. When they cease manufacturing or selling Listerine the condition for continued payment comes to an end and the obligation to pay terminates. This is the plain meaning of the language which the parties used.

Moreover, this is not a case in which the promisor's obligation will cease only on the occurrence of some fortuitous event unrelated to the subject matter of the contract. See Zimco Restaurants, Inc. v. Bartenders & Culinary Workers, supra; Paisley v. Lucas, supra; Cronk v. Vogts Ice Cream, Inc., supra. The obligation here is conditioned upon an event arising out of the very arrangement between the parties which is the subject matter of the contract.

The Paisley case upon which plaintiff places much reliance makes this distinction clear. There an insurance company had contracted to employ the plaintiff as long as his assigned territory was responsible for producing at least a million dollars of insurance per year. Later the contract was modified and the plaintiff's employment was made indefinite. Plaintiff claimed that the contract as modified was for his lifetime. The court held that it was terminable at will. The court carefully distinguished between the terminal point of the original agreement, which would occur only when plaintiff ceased to be responsible for a volume of a million dollars per year and was directly related to the subject matter of the contract, and plaintiff's claim that the term of the modified agreement was measured by his life and bore no relation to the subject matter.

In Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E. 2d 688, the promisor's obligation to pay was contingent upon its use of certain equipment. The court rejected the contention that the obligation to pay would terminate prior to the cessation of use. It found no indefiniteness or uncertainty in the contract which required such a limitation and held that the obligation to pay was co-extensive with the continued use of the equipment.

In Cammack v. J. B. Slattery & Bros., 241 N.Y. 39, 148 N.E. 781, plaintiff had furnished defendant with a secret process. Defendant's liability to make payments therefor depended upon use. There was held to be no uncertainty as to the term of the contract nor any perpetuity of obligation, but that the obligation to pay continued as long as the defendant used the secret process which it had acquired. The court expressly rejected the defendant's contention that the contract was terminable at will because it provided no fixed termination date.

To the same effect is Ehrenworth v. George F. Stuhmer & Co., 229 N.Y. 210, 128 N.E. 108, in which defendant had promised to provide goods to the plaintiff at a fixed low price. The court rejected the contention that the contract was indefinite as to time and revocable at will. It held that it remained in effect while both parties remained in business and that it would terminate when plaintiff, a retailer, ceased carrying on his business. Such a terminal point obviously bore a rational relationship to the subject matter of the contract and this was plainly what the parties intended. See, also, Rossmassler v. Spielberger, 270 Pa. 30, 112 A. 876.

In the case at bar the obligation to continue payments as long as Lambert or his successors continue to manufacture or sell Listerine is plain from the language of the agreements and is implicit in their terms. There is no need to "construe" these contracts so as to import a condition or date of termination other than that expressed by the parties themselves in the agreements which they made. Courts must "concern [themselves] with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote". Raleigh Associates v. Henry, 302 N.Y. 467, 473, 99 N.E.2d 289, 291. An attempt to write new terms into this plain and simple agreement would be

unwarranted and gratuitous. "We may not now imply a condition which the parties chose not to insert in their contract * * *". Raner v. Goldberg, 244 N.Y. 438, 442, 155 N.E. 733, 734. See, also, Nichols v. Nichols, 306 N.Y. 490, 496, 119 N.E.2d 351. Nor is there any need to resort to extrinsic evidence in order to ascertain what the intention of the parties was, or what the termination date of the obligation to pay would be, for the agreements themselves indicate the condition upon which the obligation terminates.[6]

There is nothing unreasonable or irrational about imposing such an obligation. It is entirely rational and sensible that the obligation to make payments should be based upon the business which flows from the formula conveyed. Whether or not the obligation continues is in the control of the plaintiff itself. For the plaintiff has the right to terminate its obligation to pay whenever in good faith it desires to cease the manufacture or sale of Listerine. Cf. Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E.2d 688. See Superior Concrete Accessories v. Kemper, Mo., 284 S.W.2d 482, and compare Green v. Obergfell, 73 App.D.C. 298, 121 F.2d 46, 66–67, 138 A.L.R. 258 with Western Union Telegraph Co. v. Pennsylvania Co., 3 Cir., 129 F. 849. This would seem to end the matter.

### (3).

However, plaintiff urges with vigor that the agreement must be differently construed because it involved the conveyance of a secret formula. The main thrust of its argument is that despite the language which the parties used the court must imply a limitation upon Lambert's obligation to pay measured by the length of time that the Listerine formula remained secret.

To sustain this theory plaintiff relies upon a number of cases involving the obligations of licensees of copyrights or patents to make continuing payments to the owner or licensor, and argues that these cases are controlling here.

One of these is April Productions, Inc. v. G. Schirmer, Inc., 308 N.Y. 366, 126 N.E.2d 283. There plaintiff's predecessor had licensed defendant publisher to publish certain music and defendant agreed to "pay * * * royalties for each and every copy sold * * *". The publisher copyrighted the music in accordance with the custom of the trade. At the expiration of the original term of the copyright it was renewed by a third party who, the court assumed, was under no obligation to permit the defendant to continue publication of the music under the original license agreement. (See Miller Music Corp. v. Daniels, D.C.S.D. N.Y., 158 F.Supp. 188, affirmed 2 Cir., 265 F.2d 925, certiorari granted 80 S. Ct. 77.) In fact the defendant had entered into new agreements with the owner of the renewed copyright and was paying royalties to the renewal owner under it. Plaintiff contended that since the original license agreement mentioned no specific term, did not speak of copyright, and, in fact, did not convey an existing copyright, the defendant was obligated under the license to continue making payments to it as long as it published the

6. It may be noted that such extrinsic evidence as exists tends to support the conclusion that the parties intended that the obligation be measured by use. In a letter to Lawrence dated November 11, 1884, objecting to provisions in the draft of a modified agreement which had been prepared by Lawrence, Lambert said:

"I wrote the agreement yesterday intending to send it to your residence, but was prevented by company.

"*I have made the change manufacfacture & sell not or sell—I do not think*

*for the long future, we should be obligated to that.*" (Emphasis supplied.)

Lambert was actually referring to an interim agreement executed on November 15, 1884, which superseded the 1881 agreement and was in turn replaced by the 1885 agreement. The obligation to pay "royalties" on "manufacture or sale" of Listerine was carried over into the 1885 agreement without change.

There is no doubt that Lambert understood the prospective length of the obligation and that it would continue for the long future.

music, despite the fact that the original copyright had expired. The court found that the entire background of the agreement was that of copyright since absent statutory copyright protection, the first publication would have put the music in the public domain. The court therefore applied the usual rule in patent and copyright cases that a license agreement under a patent or copyright, in the absence of express language to the contrary, is construed to require the payment of royalties only until the expiration of the underlying grant.

Such a construction of the license is in all likelihood in accord with the unexpressed or imperfectly expressed intention of the parties. As the court said (308 N.Y. at pages 375–376, 126 N.E. 2d at page 289):

"Certainly, these experienced firms could not have contemplated continuation of royalty payments after the rights granted to Schirmer [the defendant licensee] had expired and the exclusive right to publish the music had vested in a third party. To accept plaintiff's position, we would have to ascribe to the parties an intent, not only that Schirmer be required to pay multiple royalties during the renewal term, * * * but also that * * * [the licensor] be entitled to exact royalties after the copyrights had actually expired and the works had entered the public domain. In our view, such an interpretation would be indefensible. 'The thought behind the phrase proclaims itself misread when the outcome of the reading is injustice or absurdity.' [Citing] Surace v. Danna, 248 N.Y. 18, 21, 161 N.E. 315, 316."

Thus, all April Productions holds, in accord with many other cases, is that when parties agree upon a license under a patent or copyright the court will assume, in the absence of express language to the contrary, that their actual intention as to the term is measured by the definite term of the underlying grant fixed by statute.

It is quite plain that were it not for the patent and copyright features of such license agreements the term would be measured by use. As the Court of Appeals said in Muzak Corp. v. Hotel Taft Corp., supra [1 N.Y.2d 42, 150 N.Y.S. 2d 174]:

"In April Productions v. G. Schirmer, Inc., 308 N.Y. 366, 126 N.E. 2d 283, we indicated that had not the term of the underlying copyrights measured the duration of the obligation to pay for the right to publish, the obligation would have been measured by use."

There are other cases on which the plaintiff relies which hold that when a patent or copyright is held to be invalid before the expiration of the statutory term of the grant the obligation to pay royalties under a license terminates. This is but another aspect of the same principle. The rationale of this line of cases is stated in Bottlers' Seal Co. v. Rainey, 225 N.Y. 369, 372–373, 122 N.E. 200, 201, as follows:

"The covenanted payments are for the right to manufacture, use, and sell free from interference. The licensor, in law, undertakes merely that it will not sue for infringement during the period covered by the agreement. * * * In legal contemplation, the enjoyment of the undisturbed use of the patent, not the mere execution of the grant, is the consideration for the royalties."

The same court said in Herzog v. Heyman, 151 N.Y. 587, 45 N.E. 1127, 1128:

"The parties, generally contemplate a transfer by the vendor to the vendee of an exclusive right vested in the former. 'The thing to be assigned is not the mere parchment on which the grant is written; it is the monopoly which the grant confers; the right of property which it creates.' [Citing] Gayler v. Wilder, 10 How. 477, 493, 13 L.Ed. 504."

The court also stated that "very clear evidence" must be found before the vendee is made to assume the risk of in-

validity. See, also, Drackett Chemical Co. v. Chamberlin Co., 6 Cir., 63 F.2d 853.

Paralleling the concept that the licensing of a patent or copyright contracts only for the statutory monopoly granted in such cases is the concept not so frequently expressed that public policy may require a termination of the obligation to pay when the patent or copyright term is ended. As the Supreme Court said in Scott Paper Co. v. Marcalus Co., 326 U.S. 249, 255–256, 66 S.Ct. 101, 104, 90 L.Ed. 47:

> "If a manufacturer or user could restrict himself, by express contract, or by any action which would * * * [prevent him] from using the invention of an expired patent, he would deprive himself and the consuming public of the advantage to be derived from his free use of the disclosures. The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws."

I see nothing in any of the cases which the plaintiff cites dealing with patents and copyrights which supports the theory which plaintiff advances here. Plaintiff has not cited a single case in which the rules of these cases have been applied to a contract involving the conveyance of a secret formula or a trade secret.

The sole common denominator between these cases and the case at bar is that both deal with contracts involving periodic payments and the term of such payments. The considerations which lead the courts in the patent and copyright cases cited to limit the obligation to the term of the patent or copyright have no application here. Nor can they be invoked to alter the terms of agreements such as those at bar involving quite different subject matter and which are clear and plain on their face.

In the patent and copyright cases the parties are dealing with a fixed statutory term and the monopoly granted by that term. This monopoly, created by Congress, is designed to preserve exclusivity in the grantee during the statutory term and to release the patented or copyrighted material to the general public for general use thereafter. This is the public policy of the statutes in reference to which such contracts are made and it is against this background that the parties to patent and copyright license agreements contract.

Here, however, there is no such public policy. The parties are free to contract with respect to a secret formula or trade secret in any manner which they determine for their own best interests. A secret formula or trade secret may remain secret indefinitely. It may be discovered by someone else almost immediately after the agreement is entered into. Whoever discovers it for himself by legitimate means is entitled to its use. See, e. g., Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12.

But that does not mean that one who acquires a secret formula or a trade secret through a valid and binding contract is then enabled to escape from an obligation to which he bound himself simply because the secret is discovered by a third party or by the general public. I see no reason why the court should imply such a term or condition in a contract providing on its face that payment shall be co-extensive with use. To do so here would be to rewrite the contract for the parties without any indication that they intended such a result.

It may be noted that here the parties themselves made no reference to secrecy in either the 1881 or the 1885 agreements. The word "secret" is not used anywhere in either of them. It is true that I have assumed during this discussion that the plaintiff is correct in its contention that what Lambert bargained for was a "secret" formula. But that in

no way justifies the further assumption that he also bargained for *continuing* secrecy or that there would be failure of consideration if secrecy did not continue.

 The argument that there was failure of consideration in 1931 after the agreement had been in force for some forty-five years because of disclosure then, is wholly devoid of merit. The plaintiff does not question that the conveyance to it of the "secret formula" furnished consideration for the contract. Once a contract is supported by consideration its terms are up to the parties. Whether the consideration is adequate or not is no concern of the court. Restatement of Contracts, § 81. The parties are free to fix their own terms and they have done so here. Plaintiff's argument goes only to adequacy of consideration. There is no question of failure of consideration.

 One who acquires a trade secret or secret formula takes it subject to the risk that there be a disclosure. The inventor makes no representation that the secret is non-discoverable. All the inventor does is to convey the knowledge of the formula or process which is unknown to the purchaser and which in so far as both parties then know is unknown to any one else. The terms upon which they contract with reference to this subject matter are purely up to them and are governed by what the contract they enter into provides.

If they desire the payments or royalties should continue only until the secret is disclosed to the public it is easy enough for them to say so. But there is no justification for implying such a provision if the parties do not include it in their contract, particularly where the language which they use by fair intendment provides otherwise.

The case at bar illustrates what may occur in such cases. As the undisputed facts show, the acquisition of the Lawrence formula was the base on which plaintiff's predecessors built up a very large and successful business in the antiseptic or germicide field. Even now, twenty-five or more years after it is claimed that the trade secret was disclosed to the public, plaintiff retains more than 50% of the national market in these products.

 Plaintiff lays stress on the large sums which have been spent in advertising and promoting the product, and there is no doubt that this and the business acumen of plaintiff's predecessors have contributed greatly to the success of the business. But it may be noted that the advertising and promotional material is primarily based on what are claimed to be the extraordinary merits of the formula for Listerine which plaintiff's predecessors acquired from Dr. Lawrence. Plaintiff and its predecessors have proclaimed for many years through the widest variety of advertising and promotional media the unique, indeed, almost magical properties of the formula from which Listerine is still made which is the formula conveyed by Lawrence to Lambert.

At the very least plaintiff's predecessors, through the acquisition of the Lawrence formula under this contract, obtained a head start in the field of liquid antiseptics which has proved of incalculable value through the years. There is nothing novel about business being transacted only in a small way at the outset of a contract relationship and thereafter growing far beyond what was anticipated when the contract was made. See Ehrenworth v. George F. Stuhmer & Co., supra, 229 N.Y. at pages 218–219, 128 N.E. 108. Because the business has prospered far beyond anticipations affords no basis for changing the terms of the contract the parties agreed upon when the volume was small.

There is nothing in this contract to indicate that plaintiff's predecessors bargained for more than the disclosure of the Lawrence formula which was then unknown to it. Plaintiff has pointed to no principle of law or equity which would require or permit the court gratuitously to rewrite the contract which its predecessors made for these considerations.

If plaintiff wishes to avoid its obligations under the contract it is free to do so, and, indeed, the contract itself indicates how this may be done. The fact that neither the plaintiff nor its predecessors have done so, and that the plaintiff continues to manufacture and sell Listerine under the Lawrence formula with great success, indicates how valuable the rights under the contract are and how unjust it would be to permit it to have its cake and eat it too.

Thus, I hold that under the agreements in suit plaintiff is obligated to make the periodic payments called for by them as long as it continues to manufacture and sell the preparation described in them as Listerine.

(4).

Were there any doubt about this there is one further consideration which is conclusive here. That is the practical construction given to the contract by the parties themselves throughout its long term.

It is well settled that where there is doubt or ambiguity as to the meaning of a contract the conduct of the parties in rendering or receiving performance under it may be resorted to by the courts to aid in its interpretation. The courts will follow the interpretation placed upon the contract by the parties themselves as shown by their acts and conduct. Muzak Corp. v. Hotel Taft Corp., supra; Carthage Tissue Paper Mills v. Village of Carthage, 200 N.Y. 1, 93 N.E. 60; Brockett v. National Set-Up Sales Corp., Mo.App., 227 S.W.2d 514 (not reported in State Reports); 3 Corbin on Contracts, § 558.

Here the crux of the plaintiff's argument is that its obligation to make payments under the contract terminated when there was public disclosure of the formula. Yet this is quite at variance with the conduct of plaintiff's predecessor subsequent to the time when such disclosure occurred.

While the complaint alleges that the formula was publicly disclosed prior to 1949, it is plain from the papers submitted on this motion that there was public disclosure by publication in the Journal of the American Medical Association at least as early as 1931 and probably disclosure as early as 1905. Plaintiff claims that there is an issue of fact as to when disclosure occurred. There may be such an issue as to whether it occurred in 1931 or in 1905, but there is no need to decide that issue here. I will assume for purposes of this motion that disclosure did not occur until the publication in the American Medical Association Journal in 1931, the date given by Dr. Reddish, plaintiff's own bacteriologist.

This action was commenced in 1956. Thus, some twenty-five years elapsed between public disclosure, of which the plaintiff's predecessor was fully and completely aware, and the time when the plaintiff asserted its right to terminate this obligation because of such disclosure. During that entire period the plaintiff's predecessor, with full knowledge of the facts on which it now relies, continued to make the periodic payments required by the contract without protest and without the slightest indication that it considered that its obligation had been terminated. These payments amounted to over ten million dollars. During this period the Lambert Company was no innocent lamb wandering in the wilderness of big business ready to be shorn. It carried on a highly successful business on a large scale. It had available the advice of competent counsel. It was well aware of what it considered to be the unfortunate consequences of the American Medical Association disclosures. Yet no hint of the plaintiff's present position was given by its predecessor, and, indeed, significantly enough, the present claim was not raised until after the plaintiff's predecessor was merged into the present plaintiff in 1956 and new management took control.

Moreover, in early 1950 defendant John J. Reynolds, Inc. purchased from the Lawrence heirs a one-half interest in

the 1881 and 1885 agreements in suit. The assignment of this interest was specifically brought to the attention of the Lambert Company, the plaintiff's predecessor. The president of that company wrote in connection with this assignment as follows:

"* * * This letter is not intended to recognize or create any right in you [the assignee] *in addition to those possessed by your assignors, as heretofore recognized by us,* and transferred to you by such intended assignment." (Emphasis supplied.)

Thus, the Lambert Company, plaintiff's predecessor, recognized and affirmed the continuing obligation to pay under the Lawrence Lambert agreements some nineteen years after plaintiff claims that loss of secrecy terminated the obligation.

■■■ The continued periodic payments and the affirmance of the obligation by plaintiff's predecessor long after the event upon which plaintiff relies occurred, is strong evidence that the obligation to pay still continues in force and effect, if any such evidence were needed.[7]

■■■ Plaintiff contends that the doctrine of practical construction cannot be applied here because there is no uncertainty or ambiguity in the contract. If this be the plaintiff's contention it is hoist by its own petard. For if there be no ambiguity or uncertainty in the contract and it is unnecessary to resort to practical construction to interpret it, it must be taken as it reads. If it is so taken the plaintiff's position is wholly without merit.

Plaintiff also urges, relying on cases like Brainard v. New York Central R., 242 N.Y. 125, 151 N.E. 152, 45 A.L.R. 751, and In re Chicago and E. I. Ry. Co., 7 Cir., 94 F.2d 296, that plaintiff should not be bound by a practical construction where it has misinterpreted its own legal obligation under the contract. The short answer to this is that, as I have found, there was no misinterpretation of the legal obligations under the contract by continuing to make payments to the defendants. The conduct of plaintiff's predecessor was wholly consistent with its obligation. The cases which plaintiff invokes would be applicable only if, as a matter of law, the contract had not been susceptible to the interpretation I have given it.

■■■ Plaintiff further argues that no acts of the Lambert Company subsequent to the public disclosure of the formula can constitute a practical construction of the contract since it is only the acts of the original contracting parties which can be resorted to under that doctrine. There is at least grave doubt as to whether the plaintiff's position is correct in law. See Carthage Tissue Paper Mills v. Village of Carthage, supra, 200 N.Y. at page 14, 93 N.E. 60. But even if it were, there can be no doubt that the Lambert Company was a continuation of the same corporation which entered into the agreement of 1885 and continued to perform thereunder until 1956 when merged with the present plaintiff. The argument that the defendants' rights derive from the 1881 agreement negotiated by Lambert individually and that therefore it is only the acts of Lambert himself which could be resorted to for practical construction, requires no discussion. Lambert *was* the Lambert Pharmacal Company and Lambert, on its behalf, negotiated the 1885 agreement by which the obligations of the 1881 agreement were modified, and as modified assumed by that corporation.

### (5).

Finally, plaintiff urges that defendants cannot have summary judgment because there are material issues of fact which require a trial.

---

7. Evidence of a similar course of conduct was held to be an acknowledgment of the continuance of the obligation to make payments for use in Muzak Corp. v. Hotel Taft Corp., supra, 1 N.Y.2d at page 46, 150 N.Y.S.2d 171, 133 N.E.2d 688.

In reaching the conclusion that the defendants should be awarded summary judgment I have borne in mind that "a litigant has a right to a trial where there is the slightest doubt as to the facts". Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135. I have found no such doubt.

Plaintiff, despite voluminous papers and exhaustive briefs, has failed to point to any fact in dispute which is material to the issues I have decided, or, indeed, of even slight significance. Whatever disputes as to facts there may be are merely peripheral and none of them affect in any way the determination I am making here. During the course of this discussion, wherever there was any question as to the facts I have accepted plaintiff's own version.

Plaintiff urges that United States v. Bethlehem Steel Corp., D.C.S.D.N.Y., 157 F.Supp. 877, 879, is apposite and requires the denial of summary judgment. But that case, arising under the antitrust laws and involving complex questions of fact and law has no bearing here. A trial in this case would not, as in the Bethlehem case, "bring into sharper focus * * * issues of importance which have been obscured by voluminous affidavits * * * and the conflicting conclusions which the parties contend are to be drawn from the multitude of facts * * *".

No authority suggests that mere bulk of papers can or should help a litigant to avoid summary judgment in the mere hope that something might turn up on a trial. See Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715; Schneider v. McKesson-Robbins, Inc., 2 Cir., 254 F.2d 827.

Defendants' motions for summary judgment are in all respects granted. Judgment for defendants dismissing the second amended complaint will be entered accordingly.

It is so ordered.