Elisabeth H. MONTGOMERY, as Executrix of the Estate of Elisabeth H. Hogan, and Philip B. Johnson, copartners doing business as Cosmos Associates, Plaintiffs,

v.

KALAK WATER COMPANY OF NEW YORK, INC., Defendant.

United States District Court
S. D. New York.

July 6, 1961.

Boal, McQuade & Fitzpatrick, New York City, Arthur M. Boal, New York City, of counsel, for plaintiffs.

Weil, Gotshal & Manges, New York City, Edward C. Wallace, Ira M. Millstein, and Marshall C. Berger, New York City, of counsel, for defendant.

METZNER, District Judge.

This is an action for an accounting of royalties allegedly due since May 1, 1950 under a written agreement dated February 13, 1915 between Kalak Water Company of California, a corporation, and W. W. Solliday and W. C. Schalck. The plaintiffs, Montgomery and Johnson, are successors in interest to Kalak Water Company of California, and the defendant, Kalak Water Company of New York, was formed by and succeeded to the interests of Solliday and Schalck.

The complaint also seeks, because of the alleged defaults by the defendant, the transfer to plaintiffs of the trademark "Kalak Water" and all formulas.

processes and special information used in connection with the manufacture of Kalak Water, and an injunction restraining defendant from using this trademark and such formulas, processes and information.

The defendant denies that any royalties are due under the contract or that it has defaulted or refused to carry out the terms of the agreement. In addition, it asserts several affirmative defenses.

The first affirmative defense alleges that the plaintiffs have failed to perform and are unable to perform the obligations required by the contract, which contract gave rise to a joint venture between the parties, and because of the failure to perform the plaintiffs have breached their fiduciary obligation to the defendant.

The second affirmative defense alleges that the defendant no longer uses the formula which was the subject matter of the contract.

The third affirmative defense alleges that neither the plaintiffs nor their predecessors were engaged in any business to which the trademark "Kalak Water" could have attached.

Defendant has also interposed an affirmative defense by way of setoff to the effect that the defendant by inadvertence paid royalties in excess of the amount required by the contract.

For the first counterclaim defendant seeks a return of $175,000 alleged to be the amount of the overpayment.

The second counterclaim seeks $325,000 damages because of the alleged failure of the plaintiffs to perform the conditions of the contract.

The third counterclaim seeks a declaratory judgment to the effect that defendant is the owner of the trademark "Kalak" and enjoining plaintiffs from dealing in any way with the trademark "Kalak Water".

The fourth counterclaim again alleges nonperformance by the plaintiffs, the joint venture and plaintiffs' breach of their fiduciary obligations. Defendant therefore requests a declaration that the contract is void and an accounting of the overpayment of royalties and for damages.

The contract of February 13, 1915 granted a license to Solliday and Schalck to manufacture and sell medicated water to be known as "Kalak Water," for a period of 99 years, in return for which the licensees were to pay a graduated scale of royalties dependent on the sales of "quart bottles." On July 24, 1915 Kalak Water Company of California conveyed to the licensees, pursuant to the agreement of February 13, 1915,

"all formulas, processes and special information necessary in the manufacture of its water, known as 'Kalak Water.' "

The licensees were to use their best efforts to exploit and promote the sale of Kalak Water. They had to submit to the licensor for its opinion, comment and editing all advertising material to be used in the sale of the water and be bound by the policies, opinions and instructions of the licensor. The licensor agreed to supply licensees with

"all necessary data, information, copy and materials, to enable them, from time to time, to prepare their labels, literature and advertising."

The licensor agreed to render every reasonable assistance in its power to promote the sale of the water and to cooperate with the licensees in the sale of the water, which was the common object of the agreement.

Dr. Fischer and Dr. Hogan created an alkaline water which they named Kalak Water. The formula and process were vested in the licensor corporation, the stock of which was owned by Fischer and Hogan. Solliday and Schalck were salesmen who formed the defendant corporation to assume the contract on behalf of the licensees. In February 1929 the licensor corporation was dissolved and its assets, including the contract in question, were transferred to Hogan and Fischer. This assignment was approved by the defendant corporation and the parties agreed that thereafter royalties would be

paid directly one-half to Hogan and one-half to Fischer. In May 1929 Hogan and Fischer formed a partnership known as Cosmos Associates and transferred their interests in the royalties to the partnership. In 1942 Hiram Johnson, Jr., acquired a 20 per cent interest in Cosmos Associates. Solliday died in 1935, Schalck died in 1938, Dr. Hogan died in 1942 and Dr. Fischer is presently over 80 years of age. Fischer's interest in the royalties was transferred in 1951 to Hogan's widow. Hiram Johnson, Jr., is dead and his interest is represented by his son, Philip B. Johnson.

It has been stipulated that no royalties were paid by the defendant after those for the month of April 1950 and that, if any royalties were due through December 1960, they would amount to $53,848.07.

It is obvious from the testimony that the original agreement was made by four people who knew each other very well, and while the success of the product depended on cooperation among the individuals, the arrangement was not a joint venture.

The problems of death did not seem to be within the contemplation of the parties when the contract was signed. The corporate form of the licensor, which could have had some meaning in view of the 99-year license, lost its significance when the corporate licensee consented in 1929 to the assignment of the benefits of the contract by the corporate licensor to Fischer and Hogan individually. In 1940 the parties began to understand the problems that might arise in view of the possibility of death. This is found in a letter written by Murray, president of defendant, to Dr. Hogan. However, the question of failure of performance under the contract does not appear to have been a problem. It is difficult to conceive that it was the intention of the parties that absent ability in the heirs or transferees of Hogan and Fischer to recommend or pass upon advertising material, data or other matters of this type, the contract would be at an end.

In 1950 Killeen, the then president of defendant, spoke to Johnson about revising the royalty agreement and at the same time complained that the plaintiffs were not cooperating as required by the agreement. He was vague about what he meant by lack of cooperation, but it appears he was referring to the fact that the licensees agreed to submit to the licensors for their comment and edit all literature and advertising which shall be used in connection with the sale of Kalak Water. There is no evidence that advertising had been submitted to the licensors for their approval at this time. After the telephone call, Killeen ordered that royalty payments be stopped. It would appear that this was done because the company needed money and would go into bankruptcy if the cash were used up in making the royalty payments, which Johnson had refused to renegotiate.

■ The clause in the contract requiring the licensor to render every reasonable assistance in its power to promote the sale of the water and to cooperate with the licensee in the sale of the water has not been breached. There has been no showing that the present plaintiffs have refused to, or failed to, respond to any reasonable demands of the licensee. As indicated above, their abilities in this regard are limited and this is attributable to the passage of time and not to any action of the stature necessary to be declared a breach of the terms of this contract.

The above disposes of the first affirmative defense, the counterclaim seeking damages for failure of the plaintiffs to perform the conditions of the contract and the counterclaim seeking a declaration that the contract is void.

Defendant alleges by way of affirmative defense of recoupment and counterclaim that there were overpayments of royalties in prior years. The 1915 contract provided for a fixed royalty "for every quart bottle sold." In or about 1919 the defendant reduced the size of the bottle sold from a full quart to a 24-ounce bottle, but continued to pay royalties on each bottle as though it were a full quart up until 1938. Defendant contends that the proper interpretation

of the 1915 contract required it to pay on each quart of content rather than on each quart bottle and thus argues that there were overpayments. The distinction is derived from the trade, which considers a bottle containing 24 ounces a quart bottle. Defendant has stipulated that the period of overpayment would be simply 1920–1938 and that the overpayment would be computed at 25 per cent of the total royalties (which would include royalties paid on the 6⅓-ounce "split," which defendant contends were overpayments of 150 per cent).

■ Any claim for overpayments by way of counterclaim are clearly barred by the 6-year statute of limitations, Civil Practice Act, § 48. § 61 of the New York Civil Practice Act. However, since the claim for overpayment arose "out of some feature of the transaction upon which plaintiffs' action is grounded," it may be set up by way of equitable recoupment. Cf. 4 Carmody Wait, Cyclopedia of New York Practice, pp. 451–452. This is true even in the face of § 61 of the New York Civil Practice Act. Cf. Title Guarantee & Trust Co. v. Hicks, 2d Dept.1954, 283 App.Div. 723, 127 N.Y. S.2d 340.

■ Defendant's claim for recoupment must be denied. The term "quart bottle," standing alone, might be ambiguous, but, as used in this contract and this trade, it is clear that it was intended to be a standard of bottle size rather than a measurement of fluid content. This interpretation of the contract is substantiated not only by the continuous voluntary payment of royalties on this basis by the defendant up until 1938, but by the pre-1938 correspondence concerning the royalties between defendant and plaintiffs' predecessors.

Further support for this view is found in a letter from Murray to Dr. Hogan in early 1940, when he said:

"We have a pretty nice line now consisting of the split (6 ounces), the pint (12 ounces) and the quart (24 ounces). The last is really not properly a quart any more than the 12 ounce is a pint but these sizes are so characterized in the trade."

This letter takes on added significance in view of the discussion that took place between Murray and Dr. Hogan in December of 1938 when Murray sought a reduction in the royalty payments. Dr. Hogan consented to such a reduction, but refused any adjustment for the past. For 15 years thereafter defendant did not assert this claim and it must be taken that it asserted to the interpretation of the contract as contended for by Dr. Hogan at the time of the conversation.

We now come to the affirmative defense that defendant no longer uses the formula which was the subject matter of the contract. Plaintiffs have offered no proof to contradict the testimony of Dr. Andrew Kuna, a biochemist, that Kalak Water Company of New York now manufactures the product (1) under a different process than that devised by Dr. Fischer and (2) under a different formula (although it is still an alkaline water). These changes came about in 1960, and it is defendant's contention that it is not required to pay royalties after 1960 since it is no longer using the secret process or formulas. This view is supported by the recent case of Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc., D.C.S.D.N.Y.1959, 178 F.Supp. 655, affirmed 2 Cir., 1960, 280 F.2d 197.

■ Plaintiffs' position is simply that defendant has no right to manufacture a different water and sell it under the name "Kalak" on the theory that the name, formulas and process were a single package. Plaintiffs cite no cases to support this position. The contract makes no provision in the event of a substantial change in, or abandonment of, the formulas and process by defendant. It contemplates royalties on the "said Kalak Water" and places the obligation on the defendant to "use their best effort" to sell the "said Kalak Water." In light of Seller's testimony as to the financial outlays and effort expended to sell the water under the old formulas and process, with steadily decreasing sales, and Dr.

Kuna's testimony as to the medical as well as economical need for a change in the process and formulas, the company's actions would seem reasonable. Defendant, under these facts, would seem to be entitled to abandon Dr. Fischer's formulas and process and stop paying royalties.

█ There remains the issues as to the ownership of the trademark "Kalak Water". Plaintiffs have asked that defendant be ordered to transfer the trademark to them and be enjoined from further use of it because of defendant's alleged breach of the contract. Defendant by way of counterclaim seeks a declaratory judgment declaring it the owner of the trademark. 28 U.S.C. § 2201. Defendant has used the mark continuously since 1915. It registered the mark in 1916 and republished it under the 1946 Act in 1948. It also registered the mark against a checkerboard background in 1929 and republished it in 1948 as well as renewing it in 1949. Plaintiffs' only claim to the trademark is that it "coined the name" and the contract provided that the water to be sold was "to be known" as "Kalak Water". Again plaintiffs cite no authority to support their position. It should be noted that, although the original contracting corporation was named Kalak Water Company of California, it was later dissolved and abandoned by Fischer and Hogan, and there is no claim by the plaintiffs that its predecessors ever sold any product under the name "Kalak".

It is clear that under trademark law (as distinguished from rights under the contract) plaintiffs are not entitled to the name. Mere conception of the term gives no trademark rights and it is the actual use in connection with a particular business that is required. Cf. 3 Callmann, The Law of Unfair Competition and Trademarks, pp. 1182–1185; 1 Nims, Unfair Competition and Trademarks, pp. 627–628; Rolley, Inc. v. Younghusband, 9 Cir., 1953, 204 F.2d 209, 212.

The contract makes no provision for the return of the name "Kalak" to the plaintiffs upon the abandonment of the formulas and process by the defendant.

The cases indicate that (absent a contractual provision) a licensee who manufactures an article pursuant to a licensing arrangement (either for patent or trade secrets) and sells it under a trade name has an exclusive right in that trade name. Upon the expiration or abandonment of the arrangement, the licensor has no rights in the name under which the item was manufactured. President Suspender Co. v. Macwilliam, 2 Cir., 1916, 238 F. 159; Replogle v. Air-Way Co., 1923, 52 App.D.C. 364, 287 F. 765. This rule would seem just in light of the function of trademarks, namely, "to designate the goods as the product of a particular trader and to protect his goodwill against the sale of another product as his." Cf. United Drug Co. v. Theodore Rectanus Co., 1918, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141.

Submit findings of fact and conclusions of law consonant with the above opinion