Gabrielli, J.
In the early 1920’s, respondent City of New York and intervenors Town of Hunter and Village of Tanners-ville embarked upon negotiations for the construction of a sewage system to serve the village and a portion of the town. These negotiations were prompted by the city’s need and desire to prevent the discharge of untreated sewage by residents of the area into Gooseberry Creek, a stream which fed a reservoir of the city’s water supply system in the Schoharie watershed.
In 1923, the Legislature enacted enabling legislation authorizing the city to enter into contracts with municipalities in the watershed area "for the purpose of providing, maintaining [and] operating systems and plants for the collection and disposal of sewage” (L 1923, ch 630, § 1). The statute further provided that any such contracts would be subject to the approval of the New York City Board of Estimate and Apportionment.
The negotiations culminated in an agreement in 1924 between the city and intervenors. By this agreement, the city assumed the obligation of constructing a sewage system consisting of a sewage disposal plant and sewer mains and laterals, and agreed that "all costs of construction and subsequent operation, maintenance and repair of said sewerage system with the house connections thereof and said disposal works shall be at the expense” of the city. The agreement also required the city to extend the sewer lines when "necessitated by future growth and building constructions of the respective communities”. The village and town were obligated to and did obtain the necessary easements for the construction of the system and sewage lines.
The Board of Estimate, on December 9, 1926, approved the agreement and authorized the issuance of $500,000 of "corporate stock” of the City of New York for construction of the system by appropriate resolution. It is interesting to here note that a modification of the original agreement occurred in 1925 *771 wherein the village agreed to reimburse the city for a specified amount representing the expense of changing the location of certain sewer lines. The plant was completed and commenced operation in 1928. The city has continued to maintain the plant through the ensuing years and in 1958 expended $193,-000 to rehabilitate and expand the treatment plant and facilities.
Presently, the average flow of the plant has increased from an initial figure of 118,000 gallons per day to over 600,000 gallons daily and the trial court found that the plant "was operating substantially in excess of design capacity”. The city asserts, and it is not disputed by any of the parties in this action, that the system cannot bear any significant additional "loadings” because this would result in inadequate treatment of all the sewage and consequently harm the city’s water supply. The instant controversy arose when plaintiff, who is the owner of a tract of unimproved land which he seeks to develop into 50 residential lots, applied to the city for permission to connect houses, which he intends to construct on the lots, to existing sewer lines. The city refused permission on the ground that it had no obligation to further expand the plant, which is presently operating at full capacity, to accommodate this new construction.
Plaintiff then commenced this action for declaratory and injunctive relief, in which interveners town and village joined as plaintiffs, maintaining that the 1924 agreement is perpetual in duration and obligates the city to expend additional capital funds to enlarge the existing plant or build a new one to accommodate the present and future needs of the municipalities. Both the trial court and the Appellate Division, by a divided court, held in favor of plaintiff and intervenors concluding, that, while the contract did not call for perpetual performance, the city was bound to construct additional facilities to meet increased demand until such time as the village or town is legally obligated to maintain a sewage disposal system. Two members of the court dissented in part stating that the agreement should not be construed as requiring the city to construct new or additional facilities.
We conclude that the city is presently obligated to maintain the existing plant but is not required to expand that plant or construct any new facilities to accommodate plaintiff’s substantial, or any other, increased demands on the sewage system. The initial problem encountered in ascertaining the *772 nature and extent of the city’s obligation pursuant to the 1924 agreement, is its duration. We reject, as did the courts below, the plaintiffs contention that the city is perpetually bound under the agreement. The contract did not expressly provide for perpetual performance and both the trial court and the Appellate Division found that the parties did not so intend. Under these circumstances, the law will not imply that a contract calling for continuing performance is perpetual in duration (Milton v Freideberg, 32 Misc 2d 78, 85; Warner-Lambert Pharm. Co. v John J. Reynolds, Inc., 178 F Supp 655, affd 280 F2d 197; Holt v St. Louis Union Trust Co., 52 F2d 1068, 1069; Town of Readsboro v Hoosac Tunnel & Wilmington R.R. Co., 6 F2d 733 [L. Hand, J.]; Borough of West Caldwell v Borough of Caldwell, 26 NJ 9, 28-29; 1 Williston, Contracts [3d ed], § 38, p 113).
On the other hand, the city’s contention that the contract is terminable at will because it provides for no express duration should also be rejected. In the absence of an express term fixing the duration of a contract, the courts may inquire into the intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the surrounding circumstances and the parties’ intent (Warner-Lambert Pharm. Co. v John J. Reynolds, Inc., supra, p 661; Benham v World Airways, 432 F2d 359, 361; Town of Readsboro v Hoosac Tunnel & Wilmington R. R. Co, supra, p 735). It is generally agreed that where a duration may be fairly and reasonably supplied by implication, a contract is not terminable at will (1 Williston, op. cit, p 112; 10 NY Jur, Contracts, § 412, p 426; 17 Am Jur 2d, Contracts, § 487, p 957; 17A CJS, Contracts, § 398, p 480; see, also, Restatement, Contracts 2d [Tent Draft No. 7], § 230).
While we have not previously had occasion to apply it, the weight of authority supports the related rule that where the parties have not clearly expressed the duration of a contract, the courts will imply that they intended performance to continue for a reasonable time (Colony Liq. Distrs. v Daniel Distillery-Lem Motlow Prop., 22 AD2d 247, 249-250 [Aulisi, J]; Metal Assoc. v East Side Metal Spinning & Stamping Corp., 165 F2d 163, 165; Borough of West Caldwell v Borough of Caldwell, supra, p 412; Simpson, Contracts, §48, p 74; 1 Williston, op. cit., pp 116-117; 10 NY Jur, Contracts, § 413, p 427). For compelling policy reasons, this rule has not been, and should not be, applied to contracts of employment or *773 exclusive agency, distributorship, or requirements contracts which have been analogized to employment contracts (see, e.g., Clark Paper & Mfg. Co. v Stenacher, 236 NY 312; Watson v Gugino, 204 NY 535, 541; Churchill Evangelical Assn. v Columbia Broadcasting System, 236 App Div 624; Outerbridge v Campbell, 87 App Div 597; see, also, Simpson, op. cit, p 74). The considerations relevant to such contracts do not obtain here. Thus, we hold that it is reasonable to infer from the circumstances of the 1924 agreement that the parties intended the city to maintain the sewage disposal facility until such time as the city no longer needed or desired the water, the purity of which the plant was designed to insure. The city argues that it is no longer obligated to maintain the plant because State law now prohibits persons from discharging raw sewage into streams such as Gooseberry Creek. However, the parties did not contemplate the passage of environmental control laws which would prohibit individuals or municipalities from discharging raw, untreated sewage into certain streams. Thus, the city agreed to assume the obligation of assuring that its water supply remained unpolluted and it may not now avoid that obligation for reasons not contemplated by the parties when the agreement was executed, and not within the purview of their intent, expressed or implied.
Having determined the duration of the city’s obligation, the scope of its duty remains to be defined. By the agreement, the city obligated itself to build a specifically described disposal facility and to extend the lines of that facility to meet future increased demand. At the present time, the extension of those lines would result in the overloading of the system. Plaintiff claims that the city is required to build a new plant or expand the existing facility to overcome the problem. We disagree. The city should not be required to extend the lines to plaintiffs’ property if to do so would overload the system and result in its inability to properly treat sewage. In providing for the extension of sewer lines, the contract does not obligate the city to provide sewage disposal services for properties in areas of the municipalities not presently served or even to new properties in areas which are presently served where to do so could reasonably be expected to significantly increase the demand on present plant facilities.
Thus, those paragraphs of the judgment which provide that the city is obligated to construct any additional facilities *774 required to meet increased demand and that plaintiff is entitled to full use of the sewer lines should be stricken.
Accordingly, the order of the Appellate Division should be modified and the case remitted to Supreme Court, Greene County, for the entry of judgment in accordance with the opinion herein and, as so modified, affirmed, with costs to appellants against plaintiffs-respondents only.
Chief Judge Breitel and Judges Jasen, Jones, Wachtler, Fuchsberg and Cooke concur.
Order modified, etc.