# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1890
_____

Middendorf Sports, a Maryland Sole Proprietorship

*Plaintiff - Appellee*

v.

Top Rank, Inc., a Nevada corporation

*Defendant - Appellant*

Terence Crawford, an Individual

*Defendant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 13, 2019
Filed: April 3, 2020

_____

Before GRUENDER, KELLY, and ERICKSON, Circuit Judges.

_____

KELLY, Circuit Judge.

Terence "Bud" Crawford is a successful boxer who has won and defended several boxing titles. Top Rank, Inc. and Middendorf Sports are boxing promoters

and parties to an Agreement and Release regarding Crawford's promotional rights. This breach-of-contract action requires us to interpret their Agreement and Release and decide two questions: (1) when Top Rank must pay Middendorf a fee for promoting Crawford's title defenses; and (2) whether that fee includes eight percent of Crawford's share of the gate revenues. The district court granted summary judgment to Middendorf on the first issue and ruled in Middendorf's favor on the second issue. We affirm the first ruling but reverse the second.

## I. Background

On December 7, 2010, Crawford entered into a promotional rights agreement with TKO Boxing Promotions, LLC. Crawford gave TKO the exclusive right to promote his boxing matches. TKO paid Crawford $7,500 and guaranteed him a minimum number of fights (also called "bouts") per year, with the minimum payment (or "purse") that he would receive for each bout depending on the number of rounds. The agreement was for a three-year term, but TKO had the right to terminate it for various reasons. And if Crawford had a title defense within the three-year term (or three months thereafter), the agreement would be automatically extended for up to 30 months so that TKO could promote Crawford's first five title defenses.

Shortly after Crawford and TKO signed the promotional rights agreement, TKO had financial issues and Top Rank became interested in acquiring the promotional rights for some of its fighters. On June 30, 2011, TKO and Top Rank entered into an Agreement and Release regarding Crawford's promotional rights. Top Rank agreed to pay TKO $7,500 and certain other fees. TKO agreed to terminate its agreement with Crawford and to allow Top Rank to acquire Crawford's promotional rights.

This dispute centers on two paragraphs of the Agreement and Release:

4.      Top Rank Promotional Rights Agreement. TKO hereby consents and agrees that [Top Rank] may enter into a promotional rights agreement ("Promotional Rights Agreement"), bout agreements, and other boxing-related agreements and understandings with [Crawford] and his manager, on terms acceptable to [Top Rank] in its discretion and that TKO shall have no ownership or participating rights in such agreements or the proceeds therefrom.

5.      Fee. For each Title Defense (for either the WBC, WBO, WBA, or IBF, and as defined in the Promotional Rights Agreement) of [Crawford]'s promoted by Top Rank pursuant to the Promotional Rights Agreement, TKO shall be paid a fee equal to eight percent (8%) of the purse payable to [Crawford] for such Title Defense, which amount shall be paid to TKO within five (5) business days of each bout.

On the same day that TKO and Top Rank signed the Agreement and Release, TKO and Crawford terminated their promotional rights agreement, and Top Rank and Crawford entered into a new promotional rights agreement for a five-year term beginning on July 30, 2011 (the 2011 Promotional Rights Agreement). TKO later assigned its rights under the Agreement and Release to Middendorf.

Crawford subsequently won the WBO World Lightweight title. On June 28, 2014, he defended his title and earned a purse of $500,000 in a fight that Top Rank promoted pursuant to the 2011 Promotional Rights Agreement. In accordance with paragraph five of the Agreement and Release, which requires Top Rank to pay Middendorf "a fee equal to eight percent (8%) of the purse payable to [Crawford] for such Title Defense," Top Rank paid Middendorf $40,000.

With his career on the rise, Crawford renegotiated his promotional rights agreement. On September 16, 2014, he and Top Rank entered into an Exclusive

Restated Promotional Rights Agreement which "supersede[d] and replace[d]" the 2011 Promotional Rights Agreement. The new agreement guaranteed Crawford at least two fights per year that would be featured as the main event on premium cable or pay-per-view, and it substantially increased his minimum purse per fight. "As additional compensation for [Crawford]'s participation in bouts featured as main events occurring in Omaha, Nebraska"—his hometown—Top Rank also agreed to make "additional payments" to Crawford based on a share of the gate revenues.

After Crawford and Top Rank signed the Exclusive Restated Promotional Rights Agreement, Crawford again defended his WBO World Lightweight title. He also won the WBO and WBC World Super Lightweight titles and successfully defended them on several occasions. Top Rank promoted each of Crawford's title defenses pursuant to the Exclusive Restated Promotional Rights Agreement. Top Rank agreed to pay Middendorf a fee equal to eight percent of the purse (excluding Crawford's share of the gate revenues) for the title defenses that occurred before July 30, 2016, when the 2011 Promotional Rights Agreement would have expired had it not been superseded and replaced.[1] However, Top Rank refused to pay Middendorf a fee for title defenses occurring after that date.

Middendorf filed this action alleging that the Agreement and Release required Top Rank to pay it a fee equal to eight percent of Crawford's purse for each title defense that Top Rank promoted pursuant to *a* promotional rights agreement, including title defenses that Top Rank promoted pursuant to the Exclusive Restated Promotional Rights Agreement after July 30, 2016. Middendorf also argued that

---

[1]Crawford defended his titles on five occasions before July 30, 2016. Top Rank paid Middendorf a fee for the first four fights, but it refused to pay a fee for the fifth fight, which it argued was not a "Title Defense" under the Agreement and Release. The district court rejected that argument. Top Rank has not appealed that part of the district court's decision and represents that it will now pay Middendorf for the fifth fight.

Crawford's purse, for purposes of calculating that fee, included his share of the gate revenues. Top Rank filed a motion for summary judgment arguing that the Agreement and Release only required it to pay a fee for title defenses that it promoted pursuant to *the* 2011 Promotional Rights Agreement.

The district court denied Top Rank's motion. It reasoned that "the unambiguous language of the Agreement and Release obliges Top Rank to pay Mi[dd]endorf eight percent of Crawford's purse for any Crawford title defense that Top Rank promotes pursuant to a promotional rights agreement" and that "Top Rank's interpretation of the Agreement and Release depends on reading language into it that clearly cannot be found there." The district court later granted partial summary judgment to Middendorf based on this analysis.

That left the issue of whether Crawford's purse included his share of the gate revenues. The parties suggested that, because there were no factual or evidentiary disputes as to that issue, the district court could forego a formal trial and decide the issue "based on their Trial Briefs, supporting evidence, and proposed findings of fact and conclusions of law." The district court followed the parties' suggested procedure and ruled in favor of Middendorf. This appeal followed.

## II. Analysis

"We review de novo a district court's interpretation and construction of a contract, as well as a district court's interpretation of state law." Am. Prairie Constr. Co. v. Hoich, 594 F.3d 1015, 1023 (8th Cir. 2010). Our subject matter jurisdiction in this case is based upon diversity of citizenship, and the parties agree that we are to apply Nevada law. See S. Wine & Spirits of Nev. v. Mountain Valley Spring Co., 646 F.3d 526, 531 (8th Cir. 2011). "Thus, we must attempt to predict what the state supreme court would decide if it were to address the issue." Id. (cleaned up).

Under Nevada law, "[t]he objective of interpreting contracts is to discern the intent of the contracting parties. Traditional rules of contract interpretation are employed to accomplish that result." Am. First Fed. Credit Union v. Soro, 359 P.3d 105, 106 (Nev. 2015) (cleaned up). We must "initially determine[] whether the language of the contract is clear and unambiguous; if it is, the contract will be enforced as written." Id. (cleaned up). "Every word must be given effect if at all possible." Royal Indem. Co. v. Special Serv. Supply Co., 413 P.2d 500, 502 (Nev. 1966). We are "not at liberty, either to disregard words used by the parties, . . . or to insert words which the parties have not made use of." Id. (citation omitted).

## A. The Duration of the Agreement and Release

The parties' primary dispute concerns the duration of Top Rank's obligations under the Agreement and Release. Middendorf argues that Top Rank is required to pay it a fee anytime Top Rank promotes one of Crawford's title defenses pursuant to *a* promotional rights agreement. Top Rank argues that it was only required to pay Middendorf a fee when Top Rank promoted one of Crawford's title defenses pursuant to *the* 2011 Promotional Rights Agreement. Both parties assert that the Agreement and Release is unambiguous, and neither party has offered extrinsic evidence to shed light on its meaning.[2] See Ringle v. Bruton, 86 P.3d 1032, 1039 (Nev. 2004) ("When contract language is ambiguous and incomplete . . . extrinsic evidence may be admitted to determine the parties' intent, explain ambiguities, and supply omissions.").

---

[2]Top Rank contends that, although neither party argued that the Agreement and Release was ambiguous, the district court implicitly found that it was ambiguous, and therefore should not have granted partial summary judgment to Middendorf. That argument is flatly contradicted by the district court's statement that "the Court finds the relevant contractual language to be unambiguous."

Top Rank's first argument turns on the Agreement and Release's plain language. Top Rank notes that paragraph five of the Agreement and Release only requires it to pay a fee for title defenses "promoted by Top Rank pursuant to *the* Promotional Rights Agreement." (Emphasis added). And it asserts that this is an unambiguous reference to *the* Promotional Rights Agreement that Top Rank and Crawford entered that same day.

We are not persuaded. As the district court explained, paragraph five of the Agreement and Release refers to the "Promotional Rights Agreement." Paragraph four, in turn, globally defines "Promotional Rights Agreement" to mean "a promotional rights agreement." Paragraph five thus effectively provides that Middendorf is entitled to a fee equal to eight percent of the purse for each title defense "promoted by Top Rank pursuant to a promotional rights agreement."[3]

Top Rank alternatively argues that the phrase "a promotional rights agreement" plainly means "the 2011 Promotional Rights Agreement." It notes that paragraph four of the Agreement and Release uses the plural for "bout agreements, and other boxing-related agreements and understandings" but the singular for "a promotional rights agreement." Top Rank argues that this is because the parties only intended to refer to a single agreement—the 2011 Promotional Rights Agreement.

This argument hinges on the use of the word "a" rather than the word "any." We agree with the district court that, "absent any other language actually specifying the June 30, 2011 promotional rights agreement," this is "a lot of weight for one word to carry." Because the word "a" is often used to mean "any," it cannot carry this weight. See Allstate Ins. Co. v. Foster, 693 F. Supp. 886, 889 (D. Nev. 1988)

---

[3]For this same reason, we do not agree with Top Rank that the clause, "[f]or each Title Defense (for either the WBC, WBO, WBA, or IBF, and as defined in *the Promotional Rights Agreement*)," unambiguously refers to the definition of "Title Defense" in the 2011 Promotional Rights Agreement. (Emphasis added).

(applying Nevada law) ("'A' or 'an' is an indefinite article often used in the sense of 'any' and applied to more than one individual object . . . .").

There is a good reason that the parties might have phrased "promotional rights agreement" in the singular but "bout agreements, and other boxing-related agreements and understandings" in the plural. As the district court explained, "a boxer and promoter only have one promotional rights agreement at a time." But they typically enter into numerous "bout agreements, and other boxing-related agreements and understandings" over the course of their promotional rights agreement as they negotiate the individual terms of each fight.

In light of this context and the ordinary usage of the word "a," we do not agree that the phrase "a promotional rights agreement" plainly means "the 2011 Promotional Rights Agreement." Instead, we conclude that interpreting "*a* promotional rights agreement" to mean "*the 2011* Promotional Rights Agreement" would require us to add words to the Agreement and Release that the parties did not include. That is something we cannot do. See Royal Indem. Co., 413 P.2d at 502.

On the other hand, the Agreement and Release's plain language supports Middendorf's interpretation. We do not need to modify the parties' agreement to read the words "each Title Defense" and "a promotional rights agreement" to include each title defense promoted pursuant to the Exclusive Restated Promotional Rights Agreement. See id. We only need to read "a" to mean "any," which is within its ordinary meaning. See Foster, 693 F. Supp. at 889.

We are also concerned that Top Rank's interpretation might entail an absurd result that would upset the parties' expectations. See Reno Club v. Young Inv. Co., 182 P.2d 1011, 1017 (Nev. 1947) ("A contract should not be construed so as to lead to an absurd result."). If the phrase "pursuant to the Promotional Rights Agreement" meant "pursuant to the 2011 Promotional Rights Agreement," then Middendorf would

only be entitled to a fee so long as the 2011 Promotional Rights Agreement was in effect. We agree with the district court that the "logical consequence" of this would be that Top Rank could "obviate its duties under the Agreement and Release by entering into a renegotiated promotional rights agreement with Crawford at literally any time."

Top Rank continued to pay Middendorf a fee for each of Crawford's title defenses until July 30, 2016, when the 2011 Promotional Rights Agreement would have expired. But the 2011 Promotional Rights Agreement did not expire. It was "supersede[d] and replace[d]" by a new promotional rights agreement on September 16, 2014. Top Rank has struggled to explain why, under its view of the contract, Middendorf was entitled to any payments after that date. Before the district court, it argued that its payments after September 16, 2014, were "voluntary." On appeal, it argues that the duration of the Agreement and Release was fixed by the parties' intent at the time of contracting and, at the time of contracting, the parties intended the Agreement and Release to extend until July 30, 2016. Top Rank thus asserts that, even if the Agreement and Release was expressly limited to title defenses promoted "pursuant to the 2011 Promotional Rights Agreement," Middendorf would be entitled to a fee for title defenses promoted pursuant to different promotional rights agreements—including the Exclusive Restated Promotional Rights Agreement—until July 30, 2016. But that construction would require us to go well beyond the language of the Agreement and Release to discern its meaning. And we do not think that Top Rank would have raised it for the first time on appeal if it was what the parties intended at the time of contracting.

Top Rank's next argument is that the Agreement and Release incorporates the 2011 Promotional Rights Agreement such that the two agreements, signed by different parties on the same day, in effect constitute a single contract. Nevada courts have held that separate instruments constitute a single contract when "(1) they are contemporaneously executed, (2) they concern the same subject matter, and (3) one

of the instruments refers to the other." Whitemaine v. Aniskovich, 183 P.3d 137, 141 (Nev. 2008). One contract may also be made part of another "by annexation." Lincoln Welding Works, Inc. v. Ramirez, 647 P.2d 381, 383 (Nev. 1982). But here, neither agreement explicitly refers to the other, and the 2011 Promotional Rights Agreement is not annexed to the Agreement and Release. We cannot say that these separate agreements between different parties constitute a single agreement simply because they were enacted on the same day and concern a similar subject matter. See Whitemaine, 183 P.3d at 141 (providing three requirements).

Finally, Top Rank asserts that if the Agreement and Release is not limited to the term of the 2011 Promotional Rights Agreement, there was no meeting of the minds as to the duration of the Agreement and Release, and we may cure the omission by imposing a term that is "reasonable in the circumstances." See Restatement (Second) of Contracts § 204 (Am. Law Inst. 1981). Top Rank suggests that limiting the Agreement and Release to the duration of the 2011 Promotional Rights Agreement would be reasonable in the circumstances.

Top Rank made a similar, but not identical, argument to the district court. It argued that if the Agreement and Release was not limited to the duration of the 2011 Promotional Rights Agreement, it would create a perpetual obligation in violation of Nevada public policy. The district court rejected that argument, concluding that Top Rank's obligation is not perpetual because it extends only so long as Top Rank continues to promote Crawford and Crawford continues to defend his boxing titles. See Don King Promotions, Inc. v. Douglas, 742 F. Supp. 741, 763 (S.D.N.Y. 1990) (a promotional rights agreement that covered "the entire period Douglas is world champion and a period of two years following the date on which Douglas thereafter ceases, for any reason, to be so recognized as world champion" was not a perpetual obligation (cleaned up)). We agree with the district court's analysis. And we conclude that, just as the duration of the agreement is not perpetual, it is also not omitted from the parties' agreement. The Agreement and Release contemplates that

-10-

Middendorf is entitled to a fee so long as Top Rank promotes Crawford's title defenses pursuant to a promotional rights agreement. We cannot substitute a different term that Top Rank regards as more reasonable for the term that the parties agreed to. See Royal Indem. Co., 413 P.2d at 502.

### B. Crawford's Share of the Gate Revenues

We must next decide which forms of compensation are included in Crawford's "purse" for purposes of calculating the fee that Top Rank owes Middendorf. Middendorf argues that Crawford's purse is the "total remuneration" he receives for a fight. This would include Crawford's share of the gate revenues. Top Rank, by contrast, argues that the term purse has a more limited definition established by usage and custom in the boxing industry and between the parties. It contends that this usage excludes a boxer's share of gate revenues.

The district court adopted Middendorf's interpretation. The court was troubled by Top Rank's failure to provide it with the parties' individual "bout agreements," which "might have been illuminating on this point." In the absence of record evidence "distinguish[ing] the word 'purse' here from its long-established relevant meaning," the district court turned to a dictionary definition stating that a "purse" is a "sum of money . . . offered as a prize." See Webster's New Int'l Dictionary of the English Language (1919). Applying this definition, the district court concluded that "Middendorf was to get eight percent of whatever Crawford did for a title defense."

It was appropriate for the district court to use a dictionary definition to inform its interpretation of the contract. See Reno Club, 182 P.2d at 1015 (using a dictionary definition to ascertain "the ordinary, plain and usual meaning" of a contract term). But we do not find that definition to be conclusive. Because the dictionary simply defines a purse as a "sum of money" a fighter receives for a bout, and not "all money" a fighter receives for a bout, it is consistent with both parties' arguments.

-11-

Although the record is lacking in some respects, it indicates that the parties thought of Crawford's share of the gate revenues as "additional compensation" that was separate from his purse. Crawford was not guaranteed a share of the gate revenues in the 2011 Promotional Rights Agreement. Crawford's manager testified that, before Crawford's title defense on June 28, 2014, he negotiated a separate agreement for Crawford to receive "a piece of the gate because [h]e believed it was going to be good." Top Rank's president, Todd duBoef, testified that this agreement was negotiated on a "per-bout basis" and was separate from the purse amount that would have been listed on a form submitted to the state boxing commission.

When Top Rank and Crawford renegotiated their promotional rights agreement in 2014, Top Rank agreed to guarantee Crawford a share of the gate revenues for certain fights. Paragraph 3(a) of the Exclusive Restated Promotional Rights Agreement sets forth "[t]he purses to be paid to [Crawford] for each bout featured as a main event." Paragraph 3(b) states that, "[a]s additional compensation for [Crawford]'s participation in bouts featured as main events in Omaha, Nebraska," Crawford will receive a share of the gate revenues. Crawford testified that he does not consider this "additional compensation" to be "part of [his] purse" and that he "does not divide the gate participation moneys out between [his] manager and trainer" as he does with his purse.

Although the evidence is not overwhelming, we are persuaded that the term purse, as used in the Agreement and Release, does not include a boxer's share of gate revenues. See Galardi v. Naples Polaris, LLC, 301 P.3d 364, 367 (Nev. 2013) (ambiguity is not required to consider usage and custom evidence). We conclude that the district court's contrary ruling was in error.

### III. Conclusion

For the foregoing reasons, the district court's judgment is affirmed in part and reversed in part.

_____