#30891-aff in pt & rev in pt-PJD
**2025 S.D. 74**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

LJP CONSULTING LLC, A New Jersey
Limited Liability Company,                    Plaintiff and Appellee,

v.

VERVENT, INC., A Delaware Corporation,        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DOUGLAS BARNETT
Judge

* * * *

SHAWN M. NICHOLS
CLAIRE E. WILKA of
Cadwell, Sanford, Deibert &
    Garry, LLP
Sioux Falls, South Dakota        Attorneys for defendant and
                                 appellant.


JACQUELYN A. BOUWMAN
TIM R. SHATTUCK of
Woods, Fuller, Shultz & Smith, P.C.
Sioux Falls, South Dakota        Attorneys for plaintiff and
                                 appellee.

* * * *

ARGUED
OCTOBER 9, 2025
OPINION FILED **12/30/25**

#30891

DEVANEY, Justice

[¶1.] Plaintiff, LJP Consulting LLC, entered into a Referral Agreement with Total Card, Inc. (TCI) whereby LJP was to identify and refer credit card businesses to TCI for which TCI would provide account servicing. In 2014, LJP referred First Equity Credit Card Corp. to TCI, and First Equity and TCI entered into a Servicing Agreement. Pursuant to the Referral Agreement, TCI paid LJP 3% of the servicing fees it received from First Equity. In late 2020, TCI's assets and liabilities, including the obligations under the Referral Agreement and Servicing Agreement, were acquired by Defendant, Vervent, Inc. Vervent continued to provide the services that TCI had provided to First Equity and paid LJP the 3% referral fee for the accounts serviced during the first two months after the acquisition. However, in January 2021, Vervent notified LJP that it was terminating the Referral Agreement and refused to pay the referral fees going forward.

[¶2.] LJP sued Vervent in April 2021, seeking a declaratory judgment that the Referral Agreement was a valid and enforceable agreement and that LJP was entitled to its 3% referral fee for so long as Vervent was servicing the First Equity accounts. Vervent moved to dismiss, asserting that the Referral Agreement was terminable at will. The circuit court denied the motion to dismiss and later granted partial summary judgment to LJP, determining that Vervent's termination of the contract constituted a breach for which it was liable, but denying summary judgment as to the damages owed to LJP. While the lawsuit was pending, First Equity was acquired by a company affiliated with Vervent, and Vervent claimed that after this acquisition, it no longer owed referral fees to LJP. LJP filed a motion

-1-

in limine to exclude any evidence of this acquisition at trial, which the circuit court initially granted.

[¶3.] A jury trial was held on the issue of damages. After the close of LJP's case-in-chief, the circuit court denied Vervent's motion for judgment as a matter of law on the issue of whether damages could include referral fees owed after the First Equity acquisition, but the court reversed its pretrial ruling on LJP's motion in limine and allowed Vervent to introduce evidence of the acquisition. The jury ultimately determined that Vervent owed $1,000,064.75 for unpaid referral fees, including fees incurred after the First Equity acquisition. The circuit court denied Vervent's post-trial renewed motion for judgment as a matter of law and awarded LJP specific performance via a permanent injunction, mandating Vervent's payment of future referral fees to LJP for so long as Vervent is servicing any active First Equity accounts. Vervent appeals, asserting the circuit court erred by concluding that the Referral Agreement was not terminable at will, by denying its motions for judgment as a matter of law precluding an award of any referral fees owed after its acquisition of First Equity, and by granting LJP prospective relief via a permanent injunction. We affirm in part and reverse in part.

### Factual and Procedural Background

[¶4.] LJP is a consulting business owned by Alonzo Primus. Among other things, LJP identifies and refers new credit card companies to entities such as TCI, which provide call center support services, collection services, and other support to those credit card companies. LJP and TCI entered into a Referral Agreement, under which TCI would pay a referral fee to LJP for each credit card company that

LJP referred to TCI. The fee was "based on the actual revenue for call center support services provided by TCI." The entirety of the Referral Agreement was set forth in a letter of understanding, dated December 15, 2012, and provided that a 3% referral fee would be paid to LJP for "the initial term of the servicing agreement" that TCI entered into with the credit card company, and that "[i]f the TCI/Client contractual relationship was renewed, an ongoing referral fee of 3% will continue to be paid to LJP."

[¶5.]        LJP referred First Equity to TCI in 2013. In August 2014, TCI and First Equity[1] entered into a Receivables Sale Agreement. The Sale Agreement provided, in relevant part:

> The term of this Agreement shall commence from the Effective Date and shall continue for five (5) years (the "Initial Term"), unless terminated earlier as provided below. After the Initial Term, this Agreement shall automatically extend for additional one (1) year periods (each a "Renewal Term").

The Sale Agreement also stated that First Equity would be liable to pay TCI the servicing fees set forth in a "Servicing Agreement[,]" which extends only "until the termination of the [Sales Agreement]." TCI paid the 3% referral fees to LJP from 2014 until TCI was acquired in November 2020 by Vervent, a diversified company that provides credit and loan services, as well as call center support and servicing for credit card programs.

---

1.      The Receivable Sales Agreement is between TCI and Progress One Financial, a wholly owned subsidiary of First Equity. For ease of understanding, Progress One and other subsidiaries of First Equity will be referred to as First Equity.

[¶6.] After Vervent acquired TCI, Vervent paid the 3% referral fee to LJP in November and December 2020, but terminated the Referral Agreement in January 2021 and ceased making referral payments to LJP. LJP brought suit against Vervent in April 2021, alleging that upon its acquisition of TCI, Vervent assumed the Referral Agreement between TCI and LJP and acquired First Equity as a client, providing the services previously provided by TCI. LJP sought a judgment declaring that the Referral Agreement is valid and enforceable against Vervent, and also alleged that Vervent breached the Referral Agreement by failing to pay referral fees to LJP for the First Equity referral to TCI.

[¶7.] Vervent moved to dismiss the complaint, claiming there was no contract between LJP and Vervent and that its termination of the Referral Agreement was lawful because the agreement had no specified term and was therefore terminable at will. Prior to the circuit court's consideration of Vervent's motion, LJP filed a motion for partial summary judgment on its claims that Vervent is obligated to continue paying the 3% referral fee for its referral of First Equity for so long as this account generates revenue and that Vervent is liable for breach given its failure to do so. The circuit court denied Vervent's motion to dismiss. In a written opinion issued on December 3, 2021, the court determined that the general rule allowing contracts without a definite term to be terminated at will is not applicable to the facts alleged here. The court also denied LJP's motion for partial summary judgment, concluding there were genuine issues of material fact relating to the claims alleged by LJP. After this ruling, LJP filed an amended complaint,

adding language regarding the parties' subsidiaries and also adding a request for specific performance of the contract in the future.

[¶8.] On May 3, 2022, LJP filed a second motion for summary judgment regarding whether Vervent's acquisition of TCI included the Referral Agreement obligations, whether Vervent has since been servicing the First Equity accounts under TCI's Servicing Agreement, and whether Vervent has breached the Referral Agreement by discontinuing the 3% referral fees. In its response to that motion, Vervent moved for additional time under SDCL 15-6-56(f) (Rule 56(f)) to conduct additional discovery before responding to LJP's motion. Vervent noted that it had acquired First Equity in April 2022 and claimed that it no longer derived revenue from the referral at issue. LJP opposed Vervent's Rule 56(f) request but stated in its reply brief that it was limiting its request for summary judgment to referral fees due *prior to* the acquisition of First Equity.

[¶9.] The circuit court granted, in part, and denied, in part, LJP's second motion for summary judgment. The court determined that "Vervent acquired all the assets and obligations of Total Card relating to the Referral Agreement with LJP and the Servicing Agreement with First Equity." The court also determined that Vervent was bound by the terms of these agreements, that Vervent was liable to pay LJP pursuant to the Referral Agreement, and that Vervent was in breach by failing to pay the referral fees. However, the court concluded that the Referral Agreement is ambiguous with respect to what constitutes "call center services" or "call center support services" and, therefore, a genuine question of material fact existed regarding the amount that Vervent owed to LJP under this agreement. The

matter was then set for trial, and a different circuit judge was later assigned to preside over the case.

[¶10.] Prior to trial, LJP moved in limine to exclude any evidence concerning Vervent's argument that it "is not liable for referral fees after the First Equity acquisition." LJP claimed that this argument had been rejected by the prior judge in the partial summary judgment ruling and noted that Vervent continued to issue monthly invoices for the servicing of the First Equity accounts. Vervent opposed this motion, noting that this issue had not in fact been decided and that evidence relating to the acquisition is relevant to the jury's determination of damages. It argued that the "First Equity contract terminated once First Equity merged into Vervent" and "First Equity no longer exists as an arm's length party." It further asserted that "[b]ecause there is no underlying contract and related revenue, there is no lawful basis for referral fee commission under the Referral Agreement."

[¶11.] The circuit court granted LJP's motion in limine, based in part on LJP's assertion that the prior judge presiding over the case had previously ruled on this issue. The court also relied on the invoices LJP had attached to its reply brief as evidence establishing that regardless of "First Equit[y's] new ownership, Vervent continues . . . to receive monthly income for servicing the First Equity accounts[.]"

[¶12.] Trial began on August 6, 2024, and LJP called two witnesses in its case-in-chief, Alonzo Primus and Paul Simon, a vice president of Vervent sales and previous national sales director for TCI. The testimony from both witnesses focused on the parties' intent with respect to what types of revenue should be included in the 3% referral fee

calculation.[2] LJP offered, as exhibits, several emails between LJP and TCI, as well as the invoices Vervent had issued for servicing the First Equity accounts. After LJP rested, Vervent filed a motion for judgment as a matter of law under SDCL 15-6-50(a) (Rule 50(a)), maintaining that "there is no legally sufficient evidentiary basis for a reasonable jury to find for LJP on the issue of damages after March 31, 2022," when Vervent acquired First Equity and "began servicing that program under an entirely distinct contract from the original underlying contract that entitled LJP to referral revenue." Vervent alternatively requested a reconsideration of the ruling granting LJP's motion in limine on this issue. The circuit court denied the motion for judgment as a matter of law but reversed its prior ruling on the motion in limine. The court allowed Vervent "to introduce evidence as to the acquisition of First Equity by Phoenix Card Group, and evidence as to the contract under which Vervent has been providing services to Phoenix [Card] Group after the acquisition of First Equity."

[¶13.]    In its case-in-chief, Vervent presented testimony from witnesses who work for Vervent to explain its corporate structure, the acquisition of First Equity by Phoenix Card, why Phoenix Card was created, and how the First Equity accounts are now being serviced pursuant to an intracompany agreement. At the close of its case-in-chief, Vervent renewed its motion for judgment as a matter of law on the issue of whether any damages were owed after the March 2022

---

2.    The jury was advised, in a preliminary instruction, that the circuit court had previously determined that the Referral Agreement at issue is an enforceable contract, that Vervent had breached the agreement by terminating it, and that the agreement is "ambiguous as to what constitutes call center services" and to "what is legally owed under that agreement." The jury was instructed to decide the amount owed, as the parties disputed this issue.

acquisition.  The circuit court denied the motion, stating this was a question of fact for the jury.

[¶14.]    After the parties presented competing arguments as to the amount of damages that should be awarded, the jury was provided a special verdict form, giving them three options for a damages award: LJP's calculation, Vervent's calculation, or the jury's own damages calculation.  The jury chose the third option, calculating damages "based on 3% of $5.25 per active accounts on the Vervent invoices to First Equity dated January 2021 through June 2024."  The jury applied this calculation to the number of accounts shown on each monthly invoice and awarded total damages of $1,000,064.75.

[¶15.]    Following trial, LJP filed a motion for a permanent injunction on its claim for specific performance that would require Vervent to pay the referral fee going forward "for so long as any account in the First Equity portfolio is being serviced by Vervent."  Vervent opposed the motion and filed a motion for a remittitur reducing the damages award to only those owed through March 2022.  The circuit court denied Vervent's motion and entered a permanent injunction mandating the payment of future referral fees.  Vervent then filed a renewed motion for judgment as a matter of law under Rule 50(b), which the circuit court denied.  Vervent now appeals, raising several issues that we restate as follows:

> 1.    Whether the circuit court erred in determining the Referral Agreement was not terminable at will.
>
> 2.    Whether the circuit court erred in denying Vervent's motions for judgment as a matter of law determining that the First Equity acquisition terminated Vervent's referral fee obligations.

3. Whether the circuit court abused its discretion in awarding LJP prospective monetary relief via a permanent injunction.

### Analysis and Decision

### *1. Whether the circuit court erred in determining the Referral Agreement was not terminable at will.*

[¶16.] Vervent asserts that the circuit court erred in denying its motion to dismiss because, in its view, the Referral Agreement does not contain a definite term and was, therefore, terminable at will. LJP argues that while Vervent could terminate the Referral Agreement as to prospective referrals, the circuit court correctly ruled that Vervent could not unilaterally terminate obligations it owed on the completed First Equity referral. In its ruling denying Vervent's motion to dismiss, the circuit court relied on the exception to the general rule that contracts with no specified duration are terminable at will, as espoused by the court in *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655 (S.D.N.Y. 1959), *aff'd*, 280 F.2d 197 (2d Cir. 1960).

[¶17.] In *Warner-Lambert,* a seminal case on this issue, the court considered the plaintiff's request for a declaratory ruling that it was no longer obligated to continue paying royalties to the defendants based on its manufacture or sale of the well-known mouthwash, Listerine. *Warner-Lambert*, 178 F. Supp. at 658. The plaintiff argued that its obligation ceased when the Listerine formula, a trade secret, was disclosed to the public. *Id.* at 660. Relying on the "traditional common law distaste for contractual rights and duties unbounded by definite limitations of time[,]" the plaintiff argued that "absent a construction that the obligation to pay is

co-extensive only with the secrecy of the formula, it must be a forbidden 'perpetuity' which the law will not enforce." *Id.* at 660–61.

[¶18.]    The court in *Warner-Lambert* recognized the general rule that if a contract has no termination date, "the contract will be held to be terminable within a reasonable time or revocable at will, dependent upon the circumstances." *Id.* (citations omitted).  The court held, however, that contracts that "provide no fixed date for the termination of the promisor's obligation but condition the obligation upon an event which would necessarily terminate the contract are in quite a different category." *Id.* at 661.  The court determined that under the plain language of the contract at issue, "[w]hen [the plaintiff or its successors] cease manufacturing or selling Listerine[,] the condition for continued payment comes to an end and the obligation to pay terminates." *Id.* at 662 (alterations added).

[¶19.]    Here, the circuit court denied Vervent's motion as a matter of law, concluding that the *Warner-Lambert* exception to the general rule applies to the contract.  We review the court's ruling de novo.  *S.D. Bd. of Regents v. Madison Hous. & Redevelopment Comm'n*, 2025 S.D. 50, ¶ 31, 25 N.W.3d 541, 549 (noting that "[c]ontract interpretation is a question of law reviewable de novo") (citation omitted).

[¶20.]    The Referral Agreement states that "[t]he referral fee will be paid for the initial term of the servicing agreement" and "[i]f the TCI/Client contractual relationship is renewed[,] an ongoing referral fee of 3% will continue to be paid to LJP."  While this Court has not been presented with the questions of how or

whether the *Warner-Lambert* exception applies to a referral contract of this nature, other courts have considered these questions.

[¶21.] In *Lura v. Multaplex, Inc.*, 129 Cal. App. 3d 410 (Cal. Ct. App. 1982), the court considered the duration of a contract that is analogous, in some respects, to the one here. The parties in *Lura* had an agreement under which the plaintiff would receive commissions on business accounts he solicited for the defendant. *Id.* at 412. The parties' agreement contained no durational term. After paying commissions for a couple of years, the defendant unilaterally discontinued making commission payments, even though the customers the plaintiff had solicited continued to do business with the defendant. The plaintiff argued the defendant "was obligated to pay commissions as long as the specified accounts obtained by [him] were maintained." *Id.* at 413. The trial court determined the defendant's obligation should not continue indefinitely and could be "terminated by either party upon notice after a reasonable time." *Id.*

[¶22.] The appellate court reversed, concluding that the contract was not perpetual. The court explained that because the defendant's "obligation to [the plaintiff] is contingent upon its sales to the accounts he secured, the agreement is of a limited duration—until respondent stops selling to those accounts." *Id.* The court noted that the defendant "could at any time terminate its obligations to [the plaintiff] by ceasing to sell to the accounts." *Id.* The court observed that "[t]he mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties." *Id.*

(quoting *Warner-Lambert*, 178 F. Supp. at 661). The court noted that the "important factor, then, is not whether the contract fails to specify a termination date, but whether there is an ascertainable event which necessarily implies termination." *Id.* at 414–15; *see also Sports v. Top Rank, Inc.*, 954 F.3d 1142, 1149 (8th Cir. 2020) (holding the promotional agreement allegedly breached did not create a perpetual obligation because the agreement "extends only so long as Top Rank continues to promote [professional boxer Bud Crawford] and Crawford continues to defend his boxing titles").

[¶23.] Vervent argues that the Referral Agreement does not plainly set forth a termination event like the agreement in *Warner-Lambert*, noting that its obligation to pay the referral fee continues *"if"* the contract is renewed, not that the obligation continues *"for so long as"* the contract is renewed. However, Vervent fails to explain how there is a meaningful distinction between these two phrases, particularly when considering the applicable contract language in its totality. It is apparent from the Referral Agreement that if there is a renewal of the contractual relationship between First Equity (the referred client) and Vervent, the ongoing referral fee will continue to be owed per the terms of the renewed contract. Notably, the Servicing Agreement between First Equity and Vervent, which Vervent assumed when it acquired TCI, defines the length of a renewal term as one year and states that either party may terminate the agreement at the end of any renewal term with 180 days' advance notice. Thus, by the plain language of the applicable contracts, if there is no longer a renewed contractual relationship between Vervent and the referred client (First Equity), Vervent's obligation to pay a referral fee ends.

Because there is an ascertainable event that would terminate Vervent's contractual obligations to LJP, we conclude the circuit court did not err in determining that the Referral Agreement was not terminable at will.

### 2. Whether the circuit court erred in denying Vervent's motions for judgment as a matter of law determining that the First Equity acquisition terminated Vervent's referral fee obligations.

[¶24.] Whether Vervent has a continuing obligation to continue paying LJP referral fees depends on whether its contractual relationship with First Equity was renewed after Vervent's special purpose entity, Phoenix Card, acquired First Equity in March 2022. This issue was central to the circuit court's rulings on LJP's motion in limine and Vervent's Rule 50 motions for judgment as a matter of law. In its initial ruling granting the motion in limine and excluding any evidence relating to Vervent's argument that it did not owe referral fees after the First Equity acquisition, the circuit court accepted LJP's argument that the prior judge presiding over the case had previously ruled on this issue. This was an incorrect assessment of the prior ruling. The impact of the acquisition of First Equity was not considered at that time because LJP expressly limited its summary judgment request to the period *before* the acquisition. Granting the motion in limine on this erroneous basis constituted an abuse of discretion.

[¶25.] However, the circuit court properly recognized its error and granted Vervent's motion for reconsideration after the close of LJP's case-in-chief. When reversing its earlier ruling, the court concluded there was a "genuine issue of fact as to the contract under which Vervent is providing services at this time." Although Vervent argues on appeal that it was prejudiced by its inability to address this topic

-13-

in voir dire, opening statements, and during LJP's case-in-chief, we need not address this issue given our determination that the circuit court erred in denying Vervent's motions for judgment as a matter of law on this issue.

a. *Rule 50(a) motion for judgment as a matter of law*

[¶26.]     At the close of LJP's case-in-chief, Vervent moved, pursuant to Rule 50(a), for judgment as a matter of law on LJP's claim for damages after the date of the First Equity acquisition. Vervent claimed that LJP did not produce evidence that the "TCI (Vervent)/Client contractual relationship [was] renewed." In its brief in support of the motion, Vervent argued that it had acquired the First Equity program and now services First Equity's credit card program under a different servicing agreement. It explained that the 2014 Servicing Agreement was not renewed and is no longer operative. As such, Vervent asserted that there is no contractual breach of the LJP Referral Agreement that entitles LJP to damages after the March 31, 2022 acquisition.

[¶27.]     LJP opposed the motion, arguing that because the court had granted its motion in limine excluding evidence regarding the First Equity acquisition, it could not present evidence on that issue in its case-in-chief without running afoul of the court's order. LJP also argued that it presented sufficient evidence—invoices for account servicing that were issued by Vervent to First Equity after its March 2022 acquisition—from which the jury could conclude that Vervent continued to service the First Equity accounts after the acquisition as it had before.

[¶28.]     The circuit court summarily denied Vervent's motion for judgment as a matter of law, so it is unclear on which basis it relied. On appeal, Vervent argues

that the "invoices were insufficient as a matter of law because invoices alone are not a contract" and that "in the absence of proof of an ongoing renewed contractual arrangement, there is no basis for LJP's ongoing recovery of damages." LJP counters, claiming the invoices were sufficient evidence of an ongoing contractual relationship and that reasonable minds could conclude from these invoices that Vervent was still being paid each month for servicing the First Equity accounts.

[¶29.]     The statute governing such motions, SDCL 15-6-50(a)(1), provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

This Court applies the de novo standard of review to the circuit court's ruling on a motion for judgment as a matter of law, giving no deference to the circuit court. *Weiland v. Bumann*, 2025 S.D. 9, ¶ 37, 18 N.W.3d 148, 158 (citations omitted). "Then, '[w]ithout weighing the evidence, the court must . . . decide if there is evidence that supports [the] verdict'" and we "view the evidence in the light most favorable to the verdict or to the nonmoving party." *Id.* (alterations in original) (citations omitted). "If sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law is not appropriate." *Id.* (citation omitted).

[¶30.]     Because the circuit court had initially precluded any evidence or testimony of Vervent's acquisition of First Equity, at the time of Vervent's initial Rule 50(a) motion, there was no evidence presented to the jury explaining how or why these First Equity invoices were generated or whether they were paid. The

invoices, which continued beyond the March 2022 acquisition, were printed on Vervent's letterhead and addressed to First Equity. When viewing them in a light most favorable to LJP, they may have been sufficient to support a determination that a renewed contractual relationship still existed between Vervent and First Equity. However, after the presentation of Vervent's case-in-chief, no such determination could be made by the jury.

> b. *Vervent's renewed Rule 50(a) motion and Rule 50(b) motion*

[¶31.] After both sides rested, Vervent orally renewed its Rule 50(a) motion for judgment as a matter of law with respect to damages after the First Equity acquisition. The circuit court summarily denied the renewed Rule 50(a) motion. After the jury returned its special verdict, Vervent filed a Rule 50(b) motion, again renewing its request for judgment as a matter of law determining that after the First Equity acquisition in March 2022, there was no renewed contractual relationship with a referred client that triggered LJP's right to an ongoing referral fee. The circuit court denied Vervent's Rule 50(b) motion.

[¶32.] Vervent argues the circuit court erred when denying its renewed motion for judgment as a matter of law. Vervent asserts the court misapplied the Referral Agreement language which requires an ongoing referral fee "if the TCI/Client contractual relationship is renewed" by entering a final judgment directing that it pay referral fees "for so long as [it] is servicing any active First Equity account." It claims the court "ignored the express contractual requirement that a referral fee is only due to the extent the 'contractual relationship' giving rise to the fee is 'renewed' after its initial term expires." Vervent argues that even if

this contractual relationship between TCI and First Equity survived its acquisition of TCI in 2020, "it is inconceivable that this 'relationship' remained intact in any legal or practical sense after March 2022, when Vervent's sister company Phoenix Card purchased and became the owner of First Equity's receivables." Vervent notes that after that point, it "was no longer servicing the receivables because of historic dealings or obligations between First Equity and TCI. Rather, [it] was servicing assets held by an affiliated company under the same corporate umbrella, pursuant to an overarching corporate business plan to invest in, own, and service the receivables 'in-house.'"

[¶33.] Vervent further notes it presented uncontested evidence at trial that First Equity is no longer its client and the First Equity accounts are no longer being serviced under the 2014 Servicing Agreement. Instead, the uncontested evidence at trial showed that "the First Equity invoices are used for intracompany tracking only, reflecting a left pocket/right pocket exchange of information, and they are no longer delivered to the Pennsylvania address to which they are addressed."

[¶34.] In response, LJP argues the motions were properly denied. It argues the contractual relationship entitling LJP to continued referral fees was supported by the invoices and by evidence proving that Vervent and Phoenix Card are separate legal entities engaged in an ongoing client contractual relationship through a formal servicing agreement to service the First Equity accounts. Additionally, LJP notes that Vervent was continuing to receive revenue from Phoenix Card for servicing the First Equity accounts.

[¶35.]     Before determining whether there was evidence to support the jury's verdict, we must revisit the meaning of the contractual language triggering an ongoing obligation to pay the referral fee.  It is apparent that the circuit court did not apply the actual language in the Referral Agreement when it entered a final judgment requiring an ongoing referral fee to be paid "for so long as Vervent is servicing any active First Equity account."  This language aligns with LJP's argument below and on appeal that a referral fee must be paid if there is any type of contractual arrangement under which Vervent is servicing and receiving revenue from credit card accounts that were once owned by First Equity.  However, the Referral Agreement does not say this.  The obligation continues only if "*the TCI/Client* contractual relationship is *renewed*."  (Emphasis added.)

[¶36.]     When interpreting a contract, we must give meaning to the specific terms used, and LJP's asserted interpretation of the governing phrase ignores the reference to a "client" relationship and the "renewal" of such.[3]  Unlike Vervent's acquisition of TCI, the *servicer*, after which Vervent assumed TCI's rights and

---

3.     On appeal, LJP contends that this language is ambiguous.  But the circuit court did not instruct the jury that this language was ambiguous or direct the jury to determine what the parties meant by it, and neither party requested such an instruction.  The only ambiguity the jury was tasked with resolving was the meaning of "call center support services" when determining how to calculate damages.  Vervent's principal argument to the court below was that it was for the court to interpret the contract and determine, *as a matter of law*, whether the undisputed evidence showed a renewed client contractual relationship.  When the court denied its motion for judgment as a matter of law, Vervent alternatively requested that the jury be able to decide, as a matter of fact, whether a renewed client contractual relationship existed after the 2022 acquisition.  The parties' arguments to the jury as to what this language means were not consistent, and the jury received no instructions on what constitutes a "renewal" or a "client."

obligations under the 2014 Servicing Agreement with its client, First Equity, the 2022 acquisition of the accounts held by First Equity, the *client*, by Vervent's sister entity, Phoenix Card, presents a much different scenario. From that point on, First Equity was no longer Vervent's client, and the First Equity accounts were serviced under a distinctly different intracompany servicing agreement.

[¶37.]     To establish a renewed client contractual relationship after the First Equity acquisition, LJP relied exclusively on "invoices" issued by Vervent to First Equity after this acquisition. These invoices are the same in all respects (except the amounts) as the invoices sent by Vervent to First Equity prior to its acquisition. They contain a header with Vervent's Sioux Falls address and identify First Equity as the client.

[¶38.]     However, Vervent's witnesses provided uncontroverted testimony supporting its claim that the invoices were not evidence of a renewed contractual relationship. Joseph Noe, Vervent's president who previously worked for TCI, explained the relationship between Phoenix Card and Vervent as two separate, but related, companies owned by the same people "as you go higher up" the corporate "entity stack." He explained that when Vervent acquired TCI, a new funding source was brought in for the credit card receivables and Phoenix Card, a special purpose entity, was created as "another place for receivables to be purchased into." Noe further explained how all the revenue from each entity "rolls up" and eventually intersects.[4]

---

4.     At trial, Paul Simon explained what a special purpose entity is and how it is utilized by companies that are not financial institutions to issue a credit card:

(continued . . .)

[¶39.]    With regard to the acquisition of First Equity, Noe explained that Phoenix Card acquired First Equity's credit card portfolio receivables and "Vervent acquired the company that is First Equity Card Corporation." He testified that after this acquisition, there were no longer any First Equity assets to service because they were "purchased out" and moved into Phoenix Card, which "already had a separate servicing agreement with Vervent." He further explained that once the assets were moved, they were subject to that servicing agreement, which *preceded* the 2022 acquisition of First Equity:

> So when we created Phoenix Card Group and Phoenix Card Group started originating its own receivables, that was not the First Equity brand. Those were brands that we manage internally at the onset when this happened in 2020. And so we had already had this agreement put in place to manage the [T]otal brand and some other brands, and that's what governed the servicing functions.

The 2020 Servicing Agreement between Phoenix Card and Vervent was introduced as an exhibit at trial. Noe testified that David Johnson signed it as CEO of Vervent, and Derek Gamble signed as secretary of Phoenix Card, but both work for

---

(. . . continued)

> So, they needed a bank to be able to issue their credit card product. . . . And what you do is you set up what's called a special purpose entity, where it's essentially a limited liability corporation in some respect. In that, all your revenue and all your expenses flow into this special purpose entity, and then whatever profit there is[,] is distributed by the members of that special purpose entity. So that could be the bank, that could be TCI, that could be a warehouse facility provider. The reason why they do that is to be able to track the revenue and the associated expenses correctly so as to distribute profitability correctly to all the parties that are involved with that particular credit card program.

Vervent.[5] Also, the address and contact person for all notices that must be delivered to the parties per the terms of this servicing agreement are exactly the same for both Phoenix Card and Vervent. Noe described this agreement as an intracompany agreement to memorialize the separate entities—the special purpose company holding the credit card portfolio receivables which makes investments and takes credit risks, and the servicing company, which does not.

[¶40.] Vervent's CEO and founder, David Johnson, also testified at trial, explaining that although Phoenix Card is a "separate company from Vervent," "it all falls into the same bucket." Johnson testified that following the acquisition of First Equity by Phoenix Card, First Equity no longer existed—it was "acquired wholly by Vervent." He also characterized the servicing arrangement between Phoenix Card and Vervent as an intracompany service. He explained that such agreement was needed to keep track of costs and revenues associated with a particular credit card program to show how profitable that part of Vervent's business is.

[¶41.] When asked about the continued invoices naming First Equity as a client after the 2022 acquisition, Johnson stated: "Well, they're no longer a client. We just haven't caught up with it in our accounting." In response to a question whether they could mail anything to the Pennsylvania address listed for First Entity on the invoices, Johnson stated, "We don't have a Pennsylvania office anymore." Noe likewise testified that First Equity was no longer Vervent's client.

---

5. Affidavits of Derek Gamble submitted in conjunction with the summary judgment submissions below identify him as Vervent's general counsel.

Noe considered First Equity as a client at the onset of their relationship, but not after Vervent acquired them.

[¶42.]     Notably, it was LJP's burden to prove that there was a *renewed client* contractual relationship obligating Vervent to continue paying a referral fee.  It did not offer any evidence in rebuttal to refute this testimony from Vervent's witnesses.  Therefore, any inferences that could have been drawn from the bare invoices LJP offered in its case-in-chief to support its contention that there was a renewed client contractual relationship could no longer be drawn after Vervent's case-in-chief.

[¶43.]     The fact that there is no longer a *renewed* client contractual relationship requiring an ongoing referral fee is also supported by the 2020 Purchase and Sale Agreement between First Equity's subsidiary (Progress Funding) and Phoenix Card.  Unlike Vervent's acquisition of TCI's servicing agreement with First Equity, in which the circuit court determined that Vervent acquired all the assets and obligations of TCI, Phoenix Card did not assume any of the obligations of First Equity after it acquired First Equity's portfolio receivables.  A provision in the 2020 Purchase Agreement between Phoenix Card and First Equity states that "[First Equity] does hereby sell, transfer, assign, set over and otherwise convey to [Phoenix Card], all of its right, title and interest in, to and under . . . all of [First Equity's] rights (*but none of its obligations*) under the Assigned Agreements."[6] (Emphasis added.)  Another provision states that "such Conveyance does not constitute and is *not* intended to result in an assumption by [Phoenix Card] or any

---

6.     The Purchase and Sale Agreement defines "Assigned Agreements" to include all portfolio documents and agreements relating to any purchased asset.

assignee thereof of *any obligation* of [First Equity] or any other Person, whether arising under the Assigned Agreements or otherwise existing." (Emphasis added.) It does not, therefore, appear that Phoenix Card assumed any obligation of First Equity to pay Vervent the servicing fees owed under the 2014 Servicing Agreement.

[¶44.] Against this undisputed backdrop, it is apparent that the preexisting 2020 intracompany servicing agreement between Phoenix Card and Vervent cannot, as a matter of law, be characterized as a "renewed client contractual relationship." The 2014 Servicing Agreement between TCI and First Equity (Progress One) was an arms-length contract, under which First Equity (Progress One) agreed to "make prompt payment" to TCI for TCI's services. In contrast, the 2020 Servicing Agreement between Phoenix Card and Vervent is an intracompany agreement between two affiliated entities that are part of the same corporate enterprise. There is no language in this agreement stating that Phoenix Card is obligated to pay Vervent for its servicing fees. Rather, it provides that Vervent "shall be entitled to *receive* Servicing fees *from Gross Receipts* received on account of the Credit Card Receivables" as provided in a separate "Loan Agreement."[7] (Emphasis added.) There is no evidence in the record showing that Phoenix Card ever paid fees to Vervent, nor is there evidence showing whether or how Vervent received fees after the First Equity acquisition.

[¶45.] When the evidence is considered in its totality, there is no evidence supporting LJP's claim that after the acquisition, Phoenix Card's contractual relationship with Vervent was a *renewal* of the contractual relationship Vervent

---

7. This "Loan Agreement" is not part of the record.

had with *the referred client*, i.e. First Equity. In a similar case, *BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90, 91 (Tenn. 2012), the parties had an agreement under which BSG would market Check Velocity's program and refer customers to it and in return, Check Velocity would make periodic payments of "fee residuals" to BSG. The agreement stated in relevant part:

> This Agreement may be terminated by either party upon a default by the other party continuing after thirty (30) days['] notice to the other of the default; provided, however, that Check Velocity's liability for any Check Velocity Net Fee Residuals payable under . . . this Agreement . . . shall survive the termination of this Agreement and continue until the expiration of the Customer agreements *as they may be renewed* under which such Check Velocity Net Fee Residuals are payable.

*Id.* at 93 (citation modified) (emphasis added). Check Velocity entered into an "Electronic Check Recovery Agreement" with a referred customer and paid fee residuals to BSG. *Id.* at 91. After a few years, Check Velocity entered into a "Collection Services Agreement" with this same customer that had new and different terms not contained in the prior agreement. *Id.* at 92. Check Velocity then stopped paying fee residuals to BSG. BSG filed a breach of contract suit against Check Velocity, and Check Velocity filed a motion for summary judgment alleging it did not owe fee residuals to BSG because the Collection Services Agreement constituted a new agreement. *Id.*

[¶46.] The parties and the court agreed that the referral agreement required Check Velocity "to continue to pay fee residuals to BSG from customer agreements so long as those customer agreements are renewed." *Id.* at 93. The court observed that the word "renew" was not defined in the agreement and that dictionary definitions of the term "renewal" contain multiple meanings, including the creation

of a new contract. The court further observed, however, that the term renewal "is frequently used as synonymous with [an] extension" of a previous relationship or contract. *Id.* The court noted that while the phrase "as they may be renewed" could be ambiguous if considered in isolation, provisions of a contract must not be read in isolation. *Id.* The court considered language in a different provision of the referral agreement pertaining to a renewal of the contract between BSG and Check Velocity which states that the initial term of the agreement was three years and "shall be renewable for successive terms of one year upon the expiration of the initial term[.]" *Id.* at 94 (emphasis omitted). The court determined that this provision "reflects the parties' understanding" that the meaning of the term "renew" as used throughout the contract "is an extension of the initial term of the contract for an additional period of time with the same terms." *Id.*

[¶47.] Similarly, here, the Referral Agreement refers to an "initial term of the servicing agreement" and states that "if the TCI/Client contractual relationship is renewed" an ongoing referral fee must be paid. As a result of the acquisition of First Equity, not only is there no "renewed" contractual relationship, there is no longer *any* contractual relationship between Vervent and the client LJP referred to TCI. Instead, Vervent is now servicing credit card portfolios owned by an affiliated special purpose entity, which is not a "client" but rather a business with whom it operates and shares revenues under the same corporate umbrella. We therefore conclude that when applying the applicable contract language to the evidence before the jury, reasonable minds could not differ on the fact that no renewed client contractual relationship remained after March 2022. Because there is no evidence

to support an award of damages after this date, the circuit court erred when denying both the Rule 50(a) motion made at the close of the evidence and the post-trial Rule 50(b) motion for judgment as a matter of law in Vervent's favor on this issue.[8]

## Conclusion

[¶48.]    We affirm the circuit court's determination that the Referral Agreement was not terminable at the will of Vervent.  We reverse the court's denial of Vervent's Rule 50 motions for judgment as a matter of law and vacate the circuit court's final judgment and order granting a permanent injunction.  We remand for the entry of a judgment determining, as a matter of law, that Vervent's liability for referral fees ended after it acquired First Equity and amending the damages award accordingly.

[¶49.]    JENSEN, Chief Justice, and SALTER and MYREN, Justices, and KERN, Retired Justice, concur.

[¶50.]    GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

---

8.    Given our determination that the circuit court erred in denying Vervent's motions for a judgment as a matter of law, we need not address Vervent's further arguments on appeal with respect to the circuit court's denial of its motion for remittitur or the court's order granting a permanent injunction.